[No. B207721. Second Dist., Div. Three. July 16, 2009.]

CITY OF LONG BEACH, Plaintiff and Appellant, v.
LOS ANGELES UNIFIED SCHOOL DISTRICT et al., Defendants and
Respondents.

COUNSEL

Robert E. Shannon, City Attorney, Michael J. Mais, Assistant City Attorney; Richards, Watson & Gershon, Steven H. Kaufmann, Ginetta L. Giovinco; Law Offices of Michael L. Oran and Michael L. Oran for Plaintiff and Appellant.

Pircher, Nichols & Meeks, Fernando Villa; and R. Bruce Tepper for Defendants and Respondents.

OPINION

ALDRICH, J.—

INTRODUCTION

Through a petition for writ of administrative mandate, the City of Long Beach (Long Beach) unsuccessfully sought to overturn the certification under the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.; Cal. Code Regs., tit. 14, § 15000 et seq.)[1] by the Los Angeles Unified School District (LAUSD) of a final environmental impact report (FEIR) evaluating the plan to construct a high school on the western edge of Long Beach. Aimed at reducing overcrowding in Banning and Carson High Schools, the proposed project is intended to serve students from the City of Carson (Carson) who attend LAUSD schools. Long Beach appeals from the denial of its writ petition contending that LAUSD has failed to provide adequate detail and analysis sufficient to enable meaningful consideration of the environmental issues raised by the proposed project. We hold that LAUSD did not prejudicially abuse its discretion because it proceeded in the

---

[1] All further statutory references are to the Public Resources Code, and all references to the CEQA regulations are to the CEQA Guidelines (Cal. Code Regs., tit. 14, § 15000 et seq.; Guidelines), unless otherwise noted.

manner required by law where the FEIR adequately analyzes the challenged impacts of the project and is sufficient as an informational document. Accordingly, we affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

### 1. *The project*

The project at issue is for the construction of a high school (the project) to serve LAUSD's South Region Planning Area on the western edge of Long Beach at its boundary with Carson. Although in the early 1970's, Long Beach annexed the area where LAUSD proposes to construct the school, for more than a century the area has lain within LAUSD's boundaries. Located within the purview of LAUSD's Local District 8, the high school will be constructed on 13.7 acres of land bounded on the north by Dominguez Park and the Aquatic Center in Carson, on the south by West Carson Street, on the east by a Union Pacific rail line, and on the west by Santa Fe Avenue. Surrounding land uses include a mix of recreational facilities, institutional, light industrial uses, and residences.

Situated on the same block of Santa Fe Avenue as the proposed school, and separated only by Dominguez Park, is Dominguez Elementary School, which has been operated by LAUSD for nearly 100 years. The project site was selected from eight proposed, and a number of other informal, sites within a designated radial "Target Search Area" around LAUSD's Carson and Banning High Schools. LAUSD created the Target Search Area because all of the schools within its reach had operated well over capacity for some time. After several public meetings and analyses of the proposed sites, LAUSD selected this as one of two that were not afflicted with environmental hazards related to industry.

Known as South Region High School No. 4, the project consists of 182,000 square feet of school facilities to serve approximately 1,809 students in grades 9 through 12. The project calls for 67 classrooms, a library/media center, a performing arts center, two gymnasiums, a multipurpose facility, food services, a career center, a health center, "set aside" classrooms, a student store, centralized administrative offices, a police facility, and space for ancillary uses and support services, such as restrooms, custodial and supply rooms, and storage. The project will also include recreational space and athletic facilities, basketball courts, and a lighted stadium to accommodate baseball, football, and soccer.

### 2. *Environmental review of the project*

In 2005, LAUSD issued a Notice of Preparation and an Initial Study. After public review, LAUSD distributed a draft environmental impact report (DEIR) for public review and comment.

In addition to analyses of the various parts of the environmental impact report (EIR), LAUSD commissioned three major studies, the Health Risk Assessment (HRA), the Pipeline Safety Study, and the Rail Safety Study (RSS), among others. The studies were appended to and made part of the EIR as appendices C, D, and E, respectively. The EIR incorporates by reference LAUSD's New School Construction Program Final EIR (the Program EIR), certified by LAUSD in 2004. The Program EIR provides an environmental overview for LAUSD's school construction process.

In February 2007, LAUSD released a recirculated DEIR addressing new information developed about additional sources of potential hazardous emissions in proximity to the site. LAUSD also revised the HRA. Twenty-two commenters, including Long Beach, submitted letters in response to the DEIR. LAUSD provided written responses to each letter.

After the public hearing, on April 24, 2007, LAUSD's Board certified the FEIR and approved the project by adopting Findings of Fact, a Mitigation Monitoring Program, and a Statement of Overriding Considerations.

### 3. *Long Beach's writ petition and the trial court's ruling*

In its ensuing writ petition, Long Beach argued that LAUSD violated provisions of CEQA because the FEIR "does not adequately analyze or evaluate the environmental impacts of the Project, relies on flawed assumptions and studies, defers mitigation measures, and fails to respond adequately to comments, thus failing to provide information that is meaningful and useful to the decisionmakers and to the public." Additionally, Long Beach alleged that the FEIR impermissibly failed to evaluate, and LAUSD failed to adopt, feasible mitigation measures to reduce the significant adverse environmental impacts caused by the project sufficient to satisfy CEQA's requirements. Finally, Long Beach alleged that the FEIR failed to include adequate assessments of (1) health and safety issues; (2) air quality; (3) traffic impacts; (4) land use; (5) cumulative impacts; and (6) reasonable project alternatives, with the result that LAUSD failed to proceed as required by law.

The trial court denied the petition. The court found that Long Beach as petitioner had not borne its burden to present credible evidence that the

agency's findings and conclusions were not supported by substantial evidence. After analyzing each of the elements of the FEIR challenged by Long Beach, the court concluded that the evidence supported LAUSD's decision that the FEIR was adequate and complied with CEQA. Long Beach's timely appeal followed the entry of judgment against it.

## CONTENTIONS

Long Beach contends that the EIR fails as an informational document and must be revised.

## DISCUSSION

### 1. *Standard of Review*

The goal behind CEQA is "to compel government at all levels to make decisions with environmental consequences in mind." (*Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 393 [253 Cal.Rptr. 426, 765 P.2d 278] (*Laurel Heights*).) Our task is to "ensure that the public and responsible officials are adequately informed ' "of the environmental consequences of their decisions *before* they are made.['] " [Citation.]" (*Berkeley Keep Jets Over the Bay Com. v. Board of Port Cmrs.* (2001) 91 Cal.App.4th 1344, 1356 [111 Cal.Rptr.2d 598].) Accordingly, our task is limited. (*Ibid.*)

Although the parties appear to disagree about the standard of review, it is well established. "If the substantive and procedural requirements of CEQA are satisfied, a project may be approved even if it would create significant and unmitigable impacts on the environment. [Citation.] 'In reviewing an agency's determination under CEQA, a court must determine whether the agency prejudicially abused its discretion. (§ 21168.5.) Abuse of discretion is established if the agency has not proceeded in a manner required by law or if the determination is not supported by substantial evidence.' [Citation.] Courts are 'not to determine whether the EIR's ultimate conclusions are correct but only whether they are supported by substantial evidence in the record and whether the EIR is sufficient as an information document.' [Citation.] ' "The appellate court reviews the administrative record independently; the trial court's conclusions are not binding on it." ' [Citation.]" (*Bakersfield Citizens for Local Control v. City of Bakersfield* (2004) 124 Cal.App.4th 1184, 1197 [22 Cal.Rptr.3d 203] (*Bakersfield*).)

" ' "The EIR must contain facts and analysis, not just the bare conclusions of the agency." [Citation.] "An EIR must include detail sufficient to enable those who did not participate in its preparation to understand and to consider

meaningfully the issues raised by the proposed project." ' [Citation.] 'CEQA requires an EIR to reflect a good faith effort at full disclosure; it does not mandate perfection, nor does it require an analysis to be exhaustive.' [Citation.]" (*Bakersfield, supra*, 124 Cal.App.4th at p. 1197, citing § 21005, subd. (b).) "The question whether an EIR is sufficient as an informative document depends on the lead agency's [LAUSD here] compliance with CEQA's requirements for the contents of an EIR: whether the EIR reflects a reasonable, good faith effort to disclose and evaluate environmental impacts and to identify and describe mitigation measures and alternatives; and whether the final EIR includes reasonable responses to comments on the draft EIR raising significant environmental issues. [Citations.]" (1 Kostka & Zischke, Practice Under the Cal. Environmental Quality Act (Cont.Ed.Bar 2009) § 11.37, p. 566 (Kostka).) "Analysis of environmental effects need not be exhaustive, but will be judged in light of what was reasonably feasible." (*Association of Irritated Residents v. County of Madera* (2003) 107 Cal.App.4th 1383, 1390–1391 [133 Cal.Rptr.2d 718] (*Irritated Residents*).) "Therefore, '[n]oncompliance with CEQA's information disclosure requirements is not per se reversible; prejudice must be shown.' [Citations.]" (*Bakersfield, supra*, at pp. 1197–1198, quoting *Irritated Residents, supra*, at p. 1391 & citing § 21005, subd. (b) [there is no presumption that error is prejudicial].)

"Failure to comply with the information disclosure requirements constitutes a prejudicial abuse of discretion when the omission of relevant information has precluded informed decisionmaking and informed public participation, regardless whether a different outcome would have resulted if the public agency had complied with the disclosure requirements. [Citations.]" (*Bakersfield, supra*, 124 Cal.App.4th at p. 1198, citing *Dry Creek Citizens Coalition v. County of Tulare* (1999) 70 Cal.App.4th 20, 26 [82 Cal.Rptr.2d 398] & *Irritated Residents, supra*, 107 Cal.App.4th at p. 1391.)

We apply the substantial evidence test to conclusions, findings, and determinations, and to challenges to the scope of an EIR's analysis of a topic, the methodology used for studying an impact, and the reliability or accuracy of the data upon which the EIR relied because these types of challenges involve factual questions. (*Bakersfield, supra*, 124 Cal.App.4th at p. 1198.) " 'Substantial evidence' " is defined as " ' "enough relevant information and reasonable inferences from this information that a fair argument can be made to support a conclusion, even though other conclusions might also be reached." ' " "Substantial evidence is not '[a]rgument, speculation, unsubstantiated opinion or narrative, evidence which is clearly inaccurate or erroneous, or evidence of social or economic impacts which do not contribute to, or are not caused by, physical impacts on the environment . . . . Substantial evidence shall include facts, reasonable assumptions predicated upon facts, and expert

opinion supported by facts.' " (*Bakersfield, supra,* at p. 1198, quoting § 21082.2, subd. (c); see Guidelines, § 15384, subds. (a), (b).)

As our Supreme Court succinctly put it, "an agency may abuse its discretion under CEQA either by failing to proceed in the manner CEQA provides or by reaching factual conclusions unsupported by substantial evidence. (§ 21168.5.) Judicial review of these two types of error differs significantly: While we determine de novo whether the agency has employed the correct procedures, 'scrupulously enforc[ing] all legislatively mandated CEQA requirements' [citation], we accord greater deference to the agency's substantive factual conclusions." (*Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 435 [53 Cal.Rptr.3d 821, 150 P.3d 709].)

With these rules in mind, we turn to the various challenges raised by Long Beach.

### 2. *Health Impacts*

Long Beach contends that the FEIR is fatally flawed because it does not adequately evaluate project-related health impacts, fails to include a reasoned analysis in support of its conclusions, and inappropriately relies on mitigation measures to reach a conclusion of "no significant impact" without providing an explanation for how the measures will be effective.

### A. *Air quality mitigation measures*

CEQA contains special provisions for environmental review of the acquisition or construction of a school. Section 21151.8 sets out the scope of the review as well as findings a school district must make.[2] Toward that end,

---

[2] The siting and construction of a school is governed in part by section 21151.8, which reads in part: "(a) An environmental impact report shall not be certified or a negative declaration shall not be approved for a project involving the purchase of a schoolsite or the construction of a new elementary or secondary school by a school district unless all of the following occur: [¶] (1) The environmental impact report or negative declaration includes information that is needed to determine if the property proposed to be purchased, or to be constructed upon, is any of the following: [¶] (A) The site of a current or former hazardous waste disposal site or solid waste disposal site and, if so, whether the wastes have been removed. [¶] (B) A hazardous substance release site identified by the Department of Toxic Substances Control in a current list adopted pursuant to Section 25356 of the Health and Safety Code for removal or remedial action pursuant to Chapter 6.8 (commencing with Section 25300) of Division 20 of the Health and Safety Code. [¶] (C) A site that contains one or more pipelines, situated underground or aboveground, that carries hazardous substances, extremely hazardous substances, or hazardous wastes, unless the pipeline is a natural gas line that is used only to supply natural gas to that school or neighborhood, or other nearby schools. [¶] (D) A site that is *within 500 feet of the edge of the closest traffic lane of a freeway or other busy traffic corridor.* [¶] (2)(A) The

LAUSD's environmental consultants conducted the HRA in January 2007, using the Industrial Source Complex Short Term Model. The consultants collected information from the United States and California Environmental Protection Agencies, and the South Coast Air Quality Management District (SCAQMD), among others. The HRA considered potential long-term exposures to hazardous emissions generated from all facilities located within one-fourth of a mile of the site that might reasonably emit hazardous or acutely hazardous air emissions (§ 21151.8, subd. (a)(2)(A)), including all sources of emissions, such as on-road (vehicle emissions) and off-road (locomotive) mobile sources, stationary sources such as the ARCO retail gas service station, Frontier Charbroiled Burgers, Raytheon, Crown Lift Trucks, DirecTV, trucking and terminals, among others, as well as risks associated with carcinogenic chemicals and noncarcinogenic sources, such as refineries, and gas stations. As required by section 21151.8, subdivision (a)(2), the assessment reviewed the area within a one-fourth-mile radius around the project site,[3] and identified 14 potential sources of hazardous emissions. One of the 14 potential sources was the Long Beach Freeway (Interstate 710), because it runs near the school boundary, even though it lies outside the 500-foot radius specified in section 21151.8, subdivision (a)(1)(D) and the one-fourth of a mile area specified by Education Code section 17213, subdivision (b) and Public Resources Code section 21151.8, subdivision (a)(2).

The FEIR found that impacts from hazardous or acutely hazardous materials emitted from facilities located near the project site would be significant because they would exceed the acceptable threshold for adults, although not for children. The FEIR proposed two mitigation measures, namely, the installation of a 70-foot setback at the southern boundary of the site (measure

---

school district, as the lead agency, in preparing the environmental impact report or negative declaration has notified in writing and consulted with the administering agency in which the proposed schoolsite is located, pursuant to Section 2735.3 of Title 19 of the California Code of Regulations, and with any air pollution control district or air quality management district having jurisdiction in the area, to identify both permitted and nonpermitted facilities within that district's authority, including, *but not limited to, freeways and busy traffic corridors, large agricultural operations, and railyards, within one-fourth of a mile of the proposed schoolsite, that might reasonably be anticipated to emit hazardous emissions or handle hazardous or extremely hazardous substances or waste.* The notification by the school district, as the lead agency, shall include a list of the locations for which information is sought." (§ 21151.8, subd. (a)(1)–(2)(A), italics added; see also Ed. Code, § 17213.)

[3] As noted in footnote 2, *ante,* that section specifies that an EIR shall not be certified for a project involving the construction of a new school unless the agency has contacted the local air pollution control district to identify whether the proposed site is "within one-fourth of a mile of" (§ 21151.8, subd. (a)(2)(A)), inter alia, "freeways and busy traffic corridors, . . . and railyards, . . . that might reasonably be anticipated to emit hazardous emissions or handle hazardous or extremely hazardous substances or waste," and lie "within 500 feet of the edge of the closest traffic lane of a freeway or other busy traffic corridor." (§ 21151.8, subd. (a)(1)(D).)

3B-1) and use of an enhanced heating, ventilation, and air conditioning filtration system capable of a 70 percent reduction of indoor particulate matter (measure 3B-2). With implementation of mitigation measures 3B-1 and 3B-2, the FEIR concluded that the estimated potential cancer risk for adults, considering all sources evaluated, would be below the state threshold and hence impacts would be reduced to a less than significant level.

Long Beach argues the FEIR provides no explanation of how mitigation measures 3B-1 and 3B-2 would work and insufficient analysis to support the FEIR's findings. It argues that "the EIR improperly fails to explain the causal relationship between these mitigation measures and a reduction to acceptable levels of carcinogenic risk."

To the contrary, LAUSD's Office of Environmental Health and Safety (OEHS) evaluated the significant health effects. The proposed mitigation measures 3B-1 and 3B-2 are in response to the evaluation. Further, LAUSD commissioned a second environmental consultant, Ensight, to review the findings in the HRA and evaluate the potential carcinogenic risks for the hypothetical administrative staff with the OEHS-proposed mitigation measures in place. After factoring in mitigation measures 3B-1 and 3B-2, the second consultant concluded that the carcinogenic risks from indoor and outdoor exposure to all contaminants would fall "below the established level of significance" for adults. Although brief, the mitigation-measure proposal contains sufficient information to enable the public to discern the analytic route LAUSD traveled from evidence to action. (*Irritated Residents, supra,* 107 Cal.App.4th at p. 1397.) The OEHS memorandum, along with Ensight's ensuing analysis, all contained in the FEIR as appendix J, together with the HRA (appendix C), provide substantial evidence for the FEIR's conclusion that mitigation measures 3B-1 and 3B-2 would reduce the impacts to less than significant. The mitigation measures were analyzed, were specific, and were defined. Together, these documents contain sufficient detail to enable those who did not participate in the FEIR's preparation to comprehend and meaningfully consider the issues raised by the proposed project and the conclusions LAUSD reached. (*Bakersfield, supra,* 124 Cal.App.4th at p. 1197.)

We disagree with Long Beach that LAUSD's response to its comment about mitigation measures 3B-1 and 3B-2 constituted an improper "scavenger hunt" because it referred to appendix J without further explanation. The level of detail required in a response to a comment depends on factors such as the significance of the issues raised, the level of detail of the proposed project, the level of detail of the comment, and the extent to which the matter is already addressed in the DEIR or responses to other comments. (*Twain Harte Homeowners Assn. v. County of Tuolumne* (1982) 138 Cal.App.3d 664,

684–686 [188 Cal.Rptr. 233]; *Cleary v. County of Stanislaus* (1981) 118 Cal.App.3d 348, 358–360 [173 Cal.Rptr. 390].) The organization of an EIR should not require readers "to sift through obscure minutiae or appendices" to find important components of the analysis. (*San Joaquin Raptor Rescue Center v. County of Merced* (2007) 149 Cal.App.4th 645, 659 [57 Cal.Rptr.3d 663].) However, in its comment to the DEIR, Long Beach asserted that there was no evidence to support the finding that mitigation measures 3B-1 and 3B-2 would reduce impacts to below significant levels. LAUSD responded in kind to Long Beach's comment by noting that the first part of Long Beach's comment summarized the HRA's contents and did not raise issues related to analysis or findings of the recirculated portions of the DEIR. But the response goes on to explain that calculations of the mitigation measures' effect were conducted and detailed descriptions could be found in the FEIR's appendix J, entitled the "HRA Mitigation Report." The response also referred Long Beach to the "Topical Response 1," a two-page response that fully described the issue. Each document cited in the comment is contained in the FEIR, either as the HRA in appendix C or the second Ensight analysis in appendix J, or as part of chapter 8, "Response to Comments."[4] The response listed the specific documents LAUSD believed supported its findings and the documents were clearly organized with the result that no sifting or hunting was required.

The question is whether LAUSD reasonably and in good faith discussed the air quality impacts and mitigation measures in detail sufficient for the public to discern from the FEIR the "analytic route the . . . agency traveled from evidence to action." (*Topanga Assn. for a Scenic Community v. County of Los Angeles* (1974) 11 Cal.3d 506, 515 [113 Cal.Rptr. 836, 522 P.2d 12].) The sufficiency of any EIR is judged "in the light of what is reasonably feasible. . . . The courts have looked not for perfection but for adequacy, completeness, and a good faith effort at full disclosure." (Guidelines, § 15151.) The FEIR's discussion in chapter 3A, with footnotes referring to the HRA, is adequate here.

## B. *Truck traffic and air quality*

Long Beach argues that the FEIR fails to take into account the close proximity of the large amounts of truck traffic in the area, the resulting

---

[4] Likewise, the FEIR adequately responded to a comment from the SCAQMD that the EIR should explain how the mitigation measures work and what pollutants would be reduced. The response states that the HRA concluded that the primary health risk, indeed 95 percent of the risk, for the site occupants would result from diesel particulate matter. The response continued by explaining that the mitigation report concluded that the two most effective ways to reduce exposure to such risks was to move away from the source or to filter the air using an enhanced system for heating, ventilation and air conditioning. It then proceeded to explain the basis for that conclusion.

exposure to diesel emissions, and the effects of particulate matter on childhood asthma and reduced respiratory capabilities.

Reviewing the HRA, it took into account not only the truck traffic and diesel emissions, but all sources of emissions, including mobile sources such as vehicle and locomotive emissions, and factored into its analysis the emissions from a wide variety of light, medium, and heavy-duty trucks, motorcycles, and cars. It analyzed the effects of all of these emissions on respiratory systems. As noted, the HRA also analyzed the 710 Freeway, although it is located more than one-fourth of a mile away from, and beyond 500 feet of, the school (§ 21151.8, subd. (a)(1)(D), (2)(A); Ed. Code, § 17213, subd. (b)). The HRA analyzed the potential of increased *respiratory illnesses*. A page and a half of the HRA was devoted to explanation of how the data were computed and analyzed. Tables A1 and A2 quantified the carcinogenic and noncarcinogenic risks by source to the respiratory system, among other things.

■ On appeal, Long Beach challenges LAUSD's responses to its comment and that of Carson. These comments raised the issue of the increase in the incidence of asthma, and in particular the findings of an unnamed, recent USC (University of Southern California) exposure assessment from the increase in rail, truck, and freeway traffic on the Alameda Corridor and Santa Fe Avenue in close proximity to the project, which traffic increase is expected to result from the rise in capacity at the Ports of Los Angeles and Long Beach. Also, Long Beach claims, there is no analysis of the impacts on the specific streets located close to the project site. Long Beach argues that LAUSD's responses did not comply with Guidelines section 15088, subdivision (c), which requires that the written response address in detail significant environmental issues raised when the lead agency's position varies with objections raised by the comments. The response must give reasons why specific comments and suggestions were not accepted. The response must have a good faith, reasoned analysis. Conclusory statements unsupported by factual information will not suffice. (*Ibid.*)

LAUSD's response to Long Beach's comment was more than " 'Comment noted' followed by a one-off statement that the project will have a net benefit to air pollution," Long Beach's contention to the contrary notwithstanding. LAUSD's response acknowledged that research indicates that adverse health effects are associated with close proximity to air pollution sources. The response then explained that regional air pollution, which extends to the entire Los Angeles metropolitan region—a nonattainment area for both coarse and fine particulate matter—is impossible to control at the level of a single school. However, the response explained how the HRA evaluated the contributions from all local facilities and land uses in accordance with section

21151.8 and Education Code section 17213 (one-fourth of a mile from hazardous emissions or substances and 500 feet of a freeway), and from the 710 Freeway. The response repeated the HRA's findings that "[b]ecause acute health effects of high particulate matter concentrations are still under scientific inquiry and specific health risk thresholds have not yet been established, their effect is impossible to quantitatively assess. However, the chronic non-carcinogenic hazard was found to be less than significant for both students and staff, while the carcinogenic hazard was found to be significant for staff members only."

LAUSD's response to Carson's comment did account for the truck activity and increase in such activity near the site. The comment explained, as described in the existing conditions section of the EIR's traffic study, that although the model used in the HRA did not analyze the impacts of truck activity on specific streets, "the traffic counts conducted for the traffic analysis *were adjusted upward* to reflect the concentration of *truck activity in the area*." (Italics added.) Furthermore, *"per the direction of the Cities of Carson and Long Beach staff,"* LAUSD applied a "2 per year growth factor," to the "existing counts [to] include adjustments for truck activity . . . to account for overall growth . . . ."[5] (Italics added.) LAUSD's response explained that its model expected truck traffic along the Alameda Corridor to increase. Finally, the response addressed the concerns about the potential for increased asthma and chronic respiratory illness by noting that the HRA's section on noncarcinogenic hazards and its conclusion, including appendix A and tables A-1 and A-2, set out the potential for increased asthma or other chronic respiratory illnesses. The response ends by explaining how the chronic hazards are anticipated to be "less than significant at the proposed school site."

The requirement of a detailed written response to comments helps to ensure that the lead agency will fully consider the environmental consequences of a decision before it is made, that the decision is well informed and open to public scrutiny, and that public participation in the environmental review process is meaningful. (*People v. County of Kern* (1974) 39 Cal.App.3d 830, 841–842 [115 Cal.Rptr. 67].) LAUSD's responses explained that the HRA had revised upward the increase in truck traffic in response to earlier comments, and acknowledged, although the HRA did not analyze the impact of truck activity for specific streets, that it otherwise considered the fact of increased truck activity in the area. Each response contained the same level of detail as the comment, and each demonstrated a good faith analysis and

---

[5] Long Beach cannot be heard to complain that LAUSD's response inadequately *assumed a mere* "2 % growth" in truck traffic without support for the assumption. As noted, LAUSD did give support: The 2 percent growth factor was utilized *"per the direction of the Cities of Carson and Long Beach staff."* (Italics added.)

observed how and where in the HRA the matter was addressed and analyzed. (*Twain Harte Homeowners Assn. v. County of Tuolumne, supra,* 138 Cal.App.3d at p. 686.) In our view, these responses to Long Beach and Carson satisfied the requirements of Guidelines section 15088, subdivision (c).

Long Beach argues that the FEIR is an insufficiently informative document because it omits cumulative impacts on air quality and traffic "and, in turn, on staff and student health" from the emissions generated by the 405 and 710 Freeways.

■ We digress first to make the point that, generally, "[t]he purpose of an environmental impact report is to identify the significant effects *on the environment* of a project . . ." (§ 21002.1, subd. (a), italics added; see also §§ 21061, par. 2, 21080 & 21100, subd. (b); Remy et al., Guide to CEQA, Cal. Environmental Quality Act (11th ed. 2006) p. 2 (Guide to CEQA)), *not the impact of the environment on the project,* such as the school's students and staff. While section 21151.8 requires the lead agency acquiring or constructing a school to consider whether the site itself contains environmental hazards or materials, the overall purpose of the cumulative impacts section of an EIR is to consider the *"change in the environment"* that results from the incremental impact of the project when added to other closely related projects. (Guidelines, § 15355, subd. (b), italics added; see *Los Angeles Unified School Dist. v. City of Los Angeles* (1997) 58 Cal.App.4th 1019, 1024–1025 [68 Cal.Rptr.2d 367] (*Los Angeles Unified School Dist.*); see also Guide to CEQA, *supra,* p. 466.) Accordingly, Long Beach's criticism of LAUSD's analysis for failure to consider the cumulative effects of air quality "on staff and student health" is not the aim of the cumulative impacts analysis.

■ Turning to the law of cumulative impact analysis, " '[t]he cumulative impact from several projects is the change in the environment which results from the incremental impact of the project when added to other closely related past, present, and reasonabl[y] foreseeable probable future projects. Cumulative impacts can result from individually minor but collectively significant projects taking place over a period of time.' (CEQA Guidelines, § 15355, subd. (b).) 'Cumulative impact analysis "assesses cumulative damage as a whole greater than the sum of its parts." ' [Citation.]" (*Irritated Residents, supra,* 107 Cal.App.4th at p. 1403; see *Los Angeles Unified School Dist., supra,* 58 Cal.App.4th at pp. 1024–1025; see also Guidelines, § 15130, subd. (a)(1).) The cumulative impact analysis is an important element of the EIR.

"[T]he relevant issue to be addressed in an EIR is not the relative amount of impact resulting from a proposed project when compared to existing

environmental problems caused by past projects, but rather *whether the additional impact associated with the project* should be considered significant in light of the serious nature of existing problems." (Guide to CEQA, *supra*, p. 473, italics omitted & added, citing *Los Angeles Unified School Dist., supra*, 58 Cal.App.4th at pp. 1025–1026.)

" 'Guidelines section 15130, subdivision (b) provides that "[t]he discussion of cumulative impacts shall reflect the severity of the impacts and their likelihood of occurrence, but the discussion need not provide as great detail as is provided of the effects attributable to the project alone. The discussion should be guided by the standards of practicality and reasonableness." . . . [A] good faith and reasonable disclosure of such impacts is sufficient.' [Citation.]" (*Irritated Residents, supra*, 107 Cal.App.4th at p. 1403.)

"We review an agency's decision regarding the inclusion of information in the cumulative impacts analysis under an abuse of discretion standard. 'The primary determination is whether it was reasonable and practical to include the projects and whether, without their inclusion, the severity and significance of the cumulative impacts were reflected adequately.' [Citation.]" (*Environmental Protection & Information Center v. California Dept. of Forestry & Fire Protection* (2008) 44 Cal.4th 459, 525 [80 Cal.Rptr.3d 28, 187 P.3d 888] (*EPIC*).)

Long Beach first challenges the geographic scope of the FEIR's analysis of the cumulative impacts on air quality and traffic. Long Beach argues that LAUSD violated Guidelines section 15130, subdivision (b)(2)[6] by "apparently only includ[ing] projects that LAUSD unilaterally, without explanation or justification, determined had 'the potential to impact study area intersections' " (emphasis omitted),[7] and omitted to consider the long list of projects

---

[6] Guidelines section 15130, subdivision (b)(2) reads: "When utilizing a list, as suggested in paragraph (1) of subdivision (b), factors to consider when determining whether to include a related project should include the nature of each environmental resource being examined, the location of the project and its type. Location may be important, for example, when water quality impacts are at issue since projects outside the watershed would probably not contribute to a cumulative effect. Project type may be important, for example, when the impact is specialized, such as a particular air pollutant or mode of traffic."

[7] Long Beach's citation to the comment letter from the SCAQMD is disingenuous. The SCAQMD commented that it was concerned about *placing* a high school in an industrial area adjacent to the Union Pacific rail line and near the 710 and 405 Freeways. This comment was aimed, not at the cumulative impacts section of the FEIR, but at the HRA. As the SCAQMD stated, "It is unclear from the DEIR what the estimated health risk is at the proposed high school[]" and noted it had not received a copy of the data files for the HRA. Citing this comment, Long Beach argues that LAUSD's response ignored the freeways and rail line. However, the response to the SCAQMD was aimed directly at the comment, explaining LAUSD's choice of sites for the project. Thus, this comment and response are not support for Long Beach's contention that LAUSD's "response ignored the freeways and rail line." Also,

named in various comments to the DEIR, which projects Long Beach feels should have been included in the analysis.[8]

■ "An EIR should define the relevant area affected in its analysis of cumulative impacts. [Citation.]" (Kostka, *supra*, § 13.45, p. 654.) "Lead agencies should define the geographic scope of the area affected by the cumulative effect and provide a reasonable explanation for the geographic limitation used." (Guidelines, § 15130, subd. (b)(3).)

"The factors to consider in determining which projects to include in the list include the nature of the resource in question, the location of the project, and the type of project. [Citation.] The CEQA Guidelines specify that location may be important when the location of other projects determines whether they contribute to an impact. For example, projects located outside a watershed would ordinarily not contribute to cumulative water quality impacts within the watershed." (Kostka, *supra*, § 13.42, p. 651; see Guidelines, § 15130, subd. (b)(2).)

An EIR's cumulative impact analysis should include all sources of related impacts, not simply similar sources or projects. (Kostka, *supra*, § 13.44, p. 653.) Thus, "when the cumulative impact being considered is water runoff from logging operations, the EIR should evaluate all projects that contribute to runoff and erosion problems, not only other logging projects . . . ." (*Ibid.*) Additionally, "[p]roject type[s] may be important . . . when the impact is specialized, such as a particular air pollutant . . . ." (Guidelines, § 15130, subd. (b)(2).) The area affected will depend on the nature of the impact being analyzed.

While the geographic context or scope to be analyzed "cannot be so narrowly defined that it necessarily eliminates a portion of the affected environmental setting" (*Bakersfield, supra*, 124 Cal.App.4th at p. 1216, citing Guidelines, § 15126.2, subd. (a)), selection of the geographic area affected by the cumulative impacts falls within the lead agency's discretion. (Guidelines, § 15130, subd. (b)(3);[9] *Ebbetts Pass Forest Watch v. Department of Forestry & Fire Protection* (2004) 123 Cal.App.4th 1331, 1351 [20 Cal.Rptr.3d 808]

the SCAQMD's letter predates the recirculation of the EIR containing the HRA and a hazards and hazardous materials impacts analysis. SCAQMD did not submit a letter after circulation of the revised DEIR that comments on the cumulative impacts section.

[8] Such past and existing projects listed by Long Beach in its comment included the Burlington Northern Santa Fe Railroad's near-dock facility and the Union Pacific Railroad's proposed expansion, both of which are located by the Terminal Island Freeway/Sepulveda Boulevard intersection "just a couple [of] miles south of this proposed high school site."

[9] Guidelines section 15130, subdivision (b)(3) reads: "Lead agencies should define the geographic scope of the area affected by the cumulative effect and provide a reasonable explanation for the geographic limitation used."

(*Ebbetts Pass*).) The selection of the assessment area is left to the agencies' expertise, and " '[a]bsent a showing of arbitrary action, we must assume that the agencies have exercised this discretion appropriately.' [Citation.]" (*Ebbetts Pass, supra*, at p. 1351.)

■ LAUSD's general analysis of cumulative impacts contained in its "Cumulative Scenario" section explains that it addressed the cumulative impact for each subject area, e.g., traffic, air quality, in the chapter associated with that subject. The Cumulative Scenario section then gives a general summary of the analysis, stating, "[a] list of all the major projects proposed or currently under development in Carson and Long Beach was evaluated and 11 of those projects were determined to have the potential to impact study area intersections. . . . All related projects are located in the City of Long Beach within an approximately *three-mile radius of the project site.* The City of Carson did not identify any specific projects in the area of the proposed site that might affect the analyzed intersections." (Italics added.) An EIR may set out a cumulative impacts section within each chapter that analyzes a particular type of impact. If this approach is used, it may also be advisable to include a summary of the analysis in a separate section on cumulative impacts. (See Kostka, *supra*, § 13.51, p. 661.) The FEIR's approach complies with this recommendation for presenting the cumulative impact analysis.

Turning to chapter 3A of the FEIR, devoted specifically to air quality, the cumulative impact portion covers a different, broader area than Long Beach suggests. The FEIR relies on the SCAQMD's CEQA Handbook for methods for determining the cumulative significance of land use projects, and relies on the strategy in the 2003 Air Quality Management Plan (AQMP)[10] for reducing the high levels of pollutants within the *South Coast Air Basin.* LAUSD's response to comments indicates that it considered the entire South Coast Air Basin with respect to ozone and particulate matter, and listed a container facility, a trucking company, terminals, and Long Beach Unified School District, among other projects. Accordingly, the FEIR contains a reasonable explanation for the geographic limitation used and its determination that the project will not cause an incremental effect. (Guidelines, § 15130.) LAUSD did not abuse its discretion in defining the geographic scope of the cumulative impact area for air quality.

The FEIR then describes how, if an individual project "reduced the rate of growth of vehicle miles traveled, and is consistent with the AQMP, then the project's cumulative impact [on air quality] could be considered less than

---

[10] One of the purposes of the AQMP is to determine the prospects and controls necessary for attaining ambient air quality standards established under the federal Clean Air Act amendments (42 U.S.C. § 7401). (*Citizens to Preserve the Ojai v. County of Ventura* (1985) 176 Cal.App.3d 421, 427 [222 Cal.Rptr. 247].)

significant." Because (1) the consultants expected the project to reduce emissions levels through the reduction of vehicle miles traveled, and (2) there was no proposed school construction within a one-mile radius of the project site, the FEIR concludes that the project *"would not contribute to cumulative impacts on air quality."* (Italics added.) Likewise, the project would not generate new hazards that would affect other sites, with the result that the FEIR determines that "the proposed project would not contribute to cumulatively considerable impacts associated with hazards or hazardous materials." The analysis of cumulative impacts is only necessary if the impact is significant and the project's incremental effect is cumulatively considerable. (Kostka, *supra*, § 13.40, p. 649, citing Guidelines, § 15130.) If the lead agency determines that a project's incremental effect is not cumulatively considerable, the EIR need only briefly describe the basis for its findings. (Kostka, *supra*, § 13.40, citing Guidelines, § 15130, subd. (a)(2).) Here, given LAUSD's conclusion that the project would not have a cumulatively considerable impact on air quality, its relatively brief explanation for its conclusion is sufficient.

As for the traffic impacts, Long Beach argues that LAUSD's cumulative impact analysis does not adequately explain why it only addressed "the potential to impact study area intersections." The traffic and transportation section of the FEIR explains that LAUSD contacted both Long Beach and Carson to compile a list of related projects to include in the study. Carson identified none, but Long Beach provided a list of 79 projects located in that city. The FEIR explains that Long Beach's exhaustive list "was subsequently narrowed down to the 11 shown on Table 3G-10 on the basis of their proximity to the project site and potential to contribute to project area traffic volumes" on surface streets in the area. In its comment, Long Beach objected to the FEIR's failure to consider *all* planned growth for the ports of Long Beach and Los Angeles, the Burlington Northern Santa Fe Railroad's proposed near-dock facility, the proposed expansion of Union Pacific Railroad's container transfer facility located on the Terminal Island Freeway/Sepulveda Boulevard intersections, just a "couple [of] miles" south of the project. (See *ante*, fn. 8.) LAUSD responded by explaining it included in the traffic analysis projects based on location, likely travel patterns, and analyzed intersections. Certain of those projects identified by Long Beach fell outside the area where a direct effect on a particular intersection was expected. The FEIR's analysis is backed by the Traffic Impact Analysis, attached as appendix H. LAUSD did not abuse its discretion in defining the geographic scope of the cumulative impact area for traffic for it provided a reasonable explanation for the geographic limitation used and its conclusion that the project will not cause an incremental effect with respect to impacts. (Guidelines, § 15130, subd. (b)(3).)

The cumulative analysis in "Traffic and Transportation" chapter 3G, concludes, after analyzing the trips generated for each of the 11 projects based on projections from the Institute of Transportation Engineers, that "[t]he project would not contribute to cumulatively considerable traffic impacts." Stated otherwise, because LAUSD concluded that the project's incremental effect would not be cumulatively considerable, the FEIR adequately provides a brief description of why the cumulative impacts would not be significant. (Kostka, *supra*, § 13.40, p. 649, citing Guidelines, § 15130, subd. (a)(2).)

Long Beach next argues that LAUSD omitted from its cumulative impacts section and its responses to comments "closely related *past*" projects identified by Long Beach such as the 405 and 710 Freeways, the ports, petroleum refineries and chemical plants. (Italics added.)

As noted, the "Cumulative Scenario," considered "*all* the major projects *proposed or currently under development* in Carson and Long Beach" (italics added) and evaluated those determined to have the potential to impact study areas. With respect to past projects, LAUSD explained in response to a comment from the Carson Environmental Coalition, that the SCAQMD's CEQA Handbook, upon which the air quality assessment of the project was based, "does not require a listing of emissions from *existing* and planned projects (e.g., existing emissions from vehicles traveling on freeways, ports, and refineries, as well as residential and commercial developments) for a cumulative air quality impacts analysis." (Italics added.) On appeal, LAUSD argues that the 405 and 710 Freeways, ports, storage company, the Alameda Corridor, the refineries and diesel fuel stations listed by Long Beach in its comments, are necessarily included in the cumulative impacts analysis because they are analyzed as *past projects* that comprise the "baseline," i.e., the environmental setting or set of environmental conditions against which it then compared its project's anticipated cumulative impact. (Guidelines, § 15125, subd. (a).)[11] LAUSD asserts that "[e]ach impacts section, of necessity, considers past projects in its impacts analysis . . . ." This is because " '[p]ast projects' may have already caused impacts that are cumulatively significant. [Citation.]" (Guide to CEQA, *supra*, pp. 472–473.)

■ Our Supreme Court explained that "an EIS/EIR must reasonably include information about past projects *to the extent* such information is relevant to the understanding of the environmental impacts of the present

---

[11] Guidelines section 15125, subdivision (a) reads: "An EIR must include a description of the physical environmental conditions in the vicinity of the project, as they exist at the time the notice of preparation is published, or if no notice of preparation is published, at the time environmental analysis is commenced, from both a local and regional perspective. This environmental setting will normally constitute the baseline physical conditions by which a lead agency determines whether an impact is significant."

project considered cumulatively with other pending and possible future projects." (*EPIC, supra,* 44 Cal.4th at p. 525, italics added.) The historical context for this project is discussed in numerous places in the FEIR. In the air quality section, for example, the FEIR describes the degradation of air quality in the entire South Coast Air Basin and the fact that it is a nonattainment area. The FEIR and response to comments list the background pollutant concentrations registered by the SCAQMD for its Source Receptor Area 4. In its hazards and hazardous materials section, the FEIR describes such sources within one-fourth of a mile of the project and a freeway or busy traffic corridor within 500 feet of a school. (§ 21151.8, subd. (a)(2)(A).) This includes the 710 Freeway, the railroad, trucking, terminals, and service stations. Looking more broadly, LAUSD explained in its response to comments that the "South Coast Air Basin is a nonattainment area for ozone and particulate matter less than 10 microns" and that new projects have the potential to add pollutants that would affect ozone and particulate matter ambient concentrations.

As explained, we review the agency's decision to include information in the cumulative impacts analysis under an abuse of discretion standard. We determine whether inclusion was reasonable and practical and whether, without their inclusion, the severity and significance of the cumulative impacts were reflected adequately. (*EPIC, supra,* 44 Cal.4th at p. 525.) Nothing in Long Beach's arguments or comments demonstrates how the FEIR's ultimate conclusion would be different if the analysis included within its sweep the 405 Freeway, the ports, the Alameda Corridor, and other sources of air pollution that had already contributed to the nonattainment status of the South Coast Air Basin before this project commenced.

Long Beach nonetheless argues that LAUSD's reliance on section 21151.8's one-fourth of a mile requirement in the cumulative impact analysis is erroneous because that statute refers to project-specific impacts, not cumulative impacts. Applying the one-fourth of a mile geographic scope to both cumulative and project-specific impacts would make no distinction between the two impacts, Long Beach argues, because each analysis would consider only sources within one-fourth of a mile, with the result that the impact conclusion would always be the same.

■ Actually, as explained, the FEIR creates different geographic areas for each impact discussed. Hence, apart from the fact that FEIR indicates it considered "*all the major projects proposed or currently under development in Carson and Long Beach*" and evaluated those having an impact irrespective of distance from the project, it included the entire South Coast Air Basin for cumulative air quality impacts, and the 11 listed projects having cumulative impacts on traffic on surface streets. (Italics added.) The FEIR limited its

consideration to one-fourth of a mile radius of the project only for hazards and hazardous materials because it was required to do so by section 21151.8, subdivision (a)(2)(A). (See *ante*, fn. 2.) In any event, contrary to Long Beach's logic, applying the same geographic scope to analysis of project-specific impacts and cumulative impacts does not necessarily result in the same conclusion. Project-specific analysis considers the effect of the project on the environment. Cumulative impacts analysis evaluates the incremental impact of the project in conjunction with, or collectively with, other closely related past, present, and reasonably foreseeable probable future projects. (Guidelines, § 15355, subd. (b); *Irritated Residents, supra*, 107 Cal.App.4th at p. 1403; *Los Angeles Unified School Dist., supra*, 58 Cal.App.4th at pp. 1024–1025.)

"[T]he discussion of cumulative impacts should be guided by the standards of practicality and reasonableness." (*EPIC, supra*, 44 Cal.4th at p. 525.) Although Long Beach disagrees with the FEIR's discussion of existing projects such as the freeways and ports, based on the record here, the FEIR analyzes *every* project within the delineated geographic areas for each subject, and so it does not "cherry-pick" the projects, despite Long Beach's contention otherwise. Therefore, we conclude that the FEIR's cumulative impacts analysis for air quality and traffic is not an abuse of discretion.

## C. *Railroad*

Long Beach contends that the FEIR fails to meaningfully analyze the risks from the Union Pacific rail line, located 30 feet from the eastern edge of the project site (the San Pedro Subdivision Line), which "*may* ship hazardous materials." (Italics added.)

The RSS did recognize that the railcars passing on the San Pedro Subdivision Line might carry hazardous materials. Wilson Geosciences Inc. prepared the RSS for the EIR pursuant to the Education Code requirements (Cal. Code Regs., tit. 5, § 14010, subd. (d)), and assessed the potential safety issues. Among other things, the RSS considered the statistical information for the years 1997 to 2004 and listed the type of cargo as the "full range of commodities," both hazardous and nonhazardous. The RSS also evaluated among other things, railroad safety, the probability of derailment, accident history, train speed, number of train movements per day or week, the statistical information for train miles, freight tonnage per train, and the number of incidents leading to derailment *and the release of hazardous materials*. The RSS concluded that the annual probability of a freight train accident and derailment within the study area would be "one train derailment every 20 years" or 2.76 per one million train-miles, i.e., "[t]he likelihood of a train accident, and a subsequent train derailment, along the railroad track that runs adjacent to the Site is very low . . . ."

The FEIR notes that historically, the San Pedro Subdivision Line was the only access to the ports of Long Beach and Los Angeles. In 2002 the Alameda Corridor freight rail line opened and the Union Pacific Railroad was required to shift all of its port-related traffic *from* the San Pedro Subdivision Line to the new corridor. As a result, use of the San Pedro Subdivision Line "has been substantially reduced, and it now supports local switching (i.e., redirecting cars for coupling with trains in other locations) and the occasional staging of *empty* trains destined for peak use at the ports." (Italics added.) Nonetheless, the FEIR explains that the San Pedro Subdivision Line could see six to eight trains per day, only four of which would run during school hours. In the event of disruption along the Alameda Corridor, however, that number could increase to 25 trains per day with train lengths of up to 90 cars. The RSS "assumed" for purposes of the analysis that the trains may ship hazardous materials. The study found more than twice the acceptable level of risk of impact from a train derailment based on the potential for derailment. The RSS found such risk to be potentially significant and recommended, as a mitigation measure that the architect incorporate a setback of 128 feet from the centerline of the track along the eastern perimeter of the proposed school site, or other engineered solution to minimize potential impacts related to potential train derailment (incorporated in the FEIR as mitigation measure 3B-4). The FEIR's ultimate conclusions are based on the substantial evidence found in the RSS. (*Bakersfield, supra,* 124 Cal.App.4th at p. 1197.) Wilson Geosciences Inc.'s RSS contained analysis and detailed facts sufficient to inform readers of the variety of risks posed by the San Pedro Subdivision Line and its proximity to the school. (*Irritated Residents, supra,* 107 Cal.App.4th at pp. 1390–1391.)

■ Long Beach argues that the FEIR provides no analysis about what *types of chemicals* the trains might carry, does not analyze whether the proposed barrier could minimize the harm caused by *each of these chemicals* if released by a train accident, or how the barrier could contain an airborne chemical release. LAUSD responded to Long Beach's concerns by describing how the mitigation measures would work: the wall, designed in concert with the pipeline mitigation, would provide a culvert to prevent the spread of any hazardous material and drain it away from the school. Also, LAUSD's OEHS develops a "Safe School Plan" for every school facility in consideration of site-specific features that may require special emergency response procedures, such as proximity to the San Pedro Subdivision Line, in compliance with Education Code section 32282 et seq.[12] As for specific chemicals that might

---

[12] Education Code sections 32282 to 32288 require the school district to develop a comprehensive school safety plan to include disaster procedures (§§ 32282, subd. (a)(2)(B), 32282.5), including comprehensive school safety "procedures for responding to the release of a pesticide or other toxic substance from properties located within one-quarter mile of a school" (§ 32284).

be on the trains, as LAUSD explained to the trial court, it was not evident that the railroad would provide specific information about its manifests. Otherwise, Long Beach and the RSS implicitly acknowledge that the likelihood that the Union Pacific Railroad might carry hazardous materials was merely hypothetical. The analysis of the effects on the environment need not be exhaustive. It will be assessed, however, in light of what was reasonably feasible. (*Irritated Residents, supra,* 107 Cal.App.4th at pp. 1390–1391.) Describing and analyzing each specific chemical the trains might theoretically carry in the future would be speculative and infeasible, and hence not required in this circumstance, given the RSS and the FEIR have considered the possibility of a derailment of a train carrying airborne and other hazardous materials.

### 3. *Traffic and Safety Impacts*

#### A. *Pedestrian safety*

Long Beach contends that the FEIR fails as an informational document and does not satisfy CEQA with respect to pedestrian safety and traffic impacts because it does not adequately analyze or mitigate project-related student traffic, dropoff, and pedestrian safety.

Specifically, Long Beach observes that two of the project site's four sides do not have continuous sidewalks and hence provide unsafe travel routes. The pedestrian safety analysis is faulty, Long Beach argues, because the FEIR does not consider the possibility that students might travel those areas and there is no analysis of the potential dangers facing students who walk through the industrial areas in the east and southeast of the project.

The FEIR's chapter 3D, "Pedestrian Access and Safety," analyzes whether the project would create unsafe walking routes to schools for students walking from local neighborhoods. Because of the importance of safety for pedestrian students, LAUSD decided to include a separate pedestrian safety subchapter in the FEIR. The FEIR declares that the only residential areas served by the project lie to the *west* of the site, not in the industrial east and southeast of the school. Figures 3D-1 and 3D-2 depict the recommended pedestrian routes, which do not take students to the industrial areas on the east and southeast side of the project. The portions of the sidewalk that are "discontinuous" are located south of the project and east of Santa Fe Avenue. To the degree that students might reside to the east and southeast of the project, they would attend schools in Long Beach and not LAUSD. The FEIR reasonably declares that "No students are expected to travel from the southeast or east of the project site since those areas are served by the Long Beach Unified School District." After surveying the eastern boundary of the

site, the FEIR finds that the industrial land uses bordering the rail line to the east preclude pedestrian access to the proposed site. Because pedestrian traffic to the east of the site would not generate any or even a significant impact, LAUSD was not required to provide additional detail or analysis related to potential pedestrian traffic east of the site. (See Guidelines, § 15143.)[13]

Long Beach observes that LAUSD's math is wrong. In its comments, it explained that LAUSD undercounted the number of students expected to walk or bike to the school. Long Beach explains that LAUSD calculated that 21.6 percent of its estimated 1,809 students who bike or walk to school would equal 125 students, rather than 391, as Long Beach computed. LAUSD responded to this comment by acknowledging that while its consultants had originally undercounted the number of students expected to walk or bike to school at 125, they modified the analysis after the comment to reflect the accurate number. After recognizing the math error, the consultants nonetheless reached the same conclusions about impacts on traffic safety.

The problems of students walking across the school's access driveway as staff vehicles enter and exit the site and the possibility of students crossing at locations without signals are also identified in the FEIR. The pedestrian subchapter found that "[w]ith 390 students expected to walk/bike to the proposed project, impacts could be potentially significant, without sufficient mitigation." The FEIR then describes mitigation measures 3D-1 through 3D-4,[14] and concludes that with implementation of those measures, pedestrian safety impacts would be reduced to less than significant levels.

Without any analysis of why it is legally insufficient, Long Beach adds in an offhand manner that the four mitigation measures constitute "deferred mitigation at that[, and] do not satisfy CEQA." Impermissible

---

[13] Guidelines section 15143 reads: "The EIR shall focus on the significant effects on the environment. The significant effects should be discussed with emphasis in proportion to their severity and probability of occurrence. *Effects dismissed in an Initial Study as clearly insignificant and unlikely to occur need not be discussed further in the EIR unless the Lead Agency subsequently receives information inconsistent with the finding in the Initial Study.* A copy of the Initial Study may be attached to the EIR to provide the basis for limiting the impacts discussed." (Italics added.)

[14] Those mitigation measures are: "3D-1 LAUSD shall coordinate with the City of Carson to install a pedestrian-activated signal at the intersection of Santa Fe Avenue and Jefferson Street to provide a safe mid-block pedestrian crossing . . . . 3D-2 Four months prior to opening of the school, LAUSD's OEHS shall contact the City of Long Beach to coordinate the installation of signs to create passenger-loading zones . . . . [¶] 3D-3 Four months prior to opening the school, LAUSD's OEHS shall contact the Cities of Carson and Long Beach to coordinate the installation of appropriate traffic controls, school warning and speed limit signs, school crosswalks, and pavement markings. [¶] 3D-4 Six months prior to the opening of the new school, LAUSD's OEHS shall contact the City of Carson traffic department regarding the preparation of a 'Pedestrian Routes to School' map."

deferral of mitigation measures occurs when an EIR puts off analysis or orders a report without either setting standards or demonstrating how the impact can be mitigated in the manner described in the EIR. (See *Endangered Habitats League, Inc. v. County of Orange* (2005) 131 Cal.App.4th 777, 794 [32 Cal.Rptr.3d 177] [requiring report without established standards is impermissible delay]; *Defend the Bay v. City of Irvine* (2004) 119 Cal.App.4th 1261, 1275 [15 Cal.Rptr.3d 176] [requiring biological report and compliance with *any* recommendations in the report is impermissible deferral of mitigation measure].) Here, mitigation measures 3D-1 through 3D-4 are not impermissibly delayed. Those measures are specific and contain identifiable timelines. They require no further evaluation or investigation and hence do not delay mitigation.

In short, the basis for the pedestrian safety consultant's conclusions are described in its 108-page traffic impact analysis, which is contained in the FEIR as appendix H, and so the FEIR's ultimate conclusions are supported by substantial evidence and the FEIR is sufficient as an information document on the topic. (*Bakersfield, supra,* 124 Cal.App.4th at p. 1197.) Furthermore the FEIR properly contains facts and analysis in sufficient detail to enable nonparticipants to understand and to consider the issues raised. (*Ibid.*)

B. *Parking*

Long Beach challenges the FEIR's parking analysis largely because there is no arrangement for student parking, despite LAUSD's estimate that there would be a demand for 402 student spaces. Claiming that the estimate of 402 is "artificially low," Long Beach argues that drivers will be forced to search for on-street parking and compete with neighborhood residents for spots. Long Beach adds that the parking problem will be compounded during football and soccer games.

LAUSD counters that the FEIR adequately analyzes the potential parking impacts. LAUSD's traffic consultant analyzed the student population at the school and estimated, based on Institute of Transportation Engineers, Parking Generation (3d ed. 2004), that there would be a total parking demand of 402 spaces. However, that estimate was probably inflated, LAUSD explained, because it included both staff cars—even though the project provides parking for staff—and students who would be dropped off, bike, or take public transportation to school. After surveying the adjacent neighborhoods at various periods of the day, including times of peak parking demand, evenings, and during athletic events, the traffic consultant determined that more than 1,000 spaces are available at any given time of the day within one-fourth of a mile of the site, even factoring in time-restricted spaces, and limited parking for street cleaning and trash pickups. Based thereon, the

traffic consultant concluded that "the existing parking supply would provide sufficient unutilized on-street parking to meet the proposed school's projected demand of 402 student parking spaces during the day[,] the adult school program[,] and the combined demand associated with simultaneous soccer and football games." After concluding that no project-related parking impacts existed, LAUSD nonetheless plans to limit the number of students parking in local neighborhoods by "promoting alternative transportation modes for students and staff through . . . public-transit, [and] designation of on-site parking areas for carpools and vanpools."

 Long Beach quotes *San Franciscans Upholding the Downtown Plan v. City and County of San Francisco* (2002) 102 Cal.App.4th 656 [125 Cal.Rptr.2d 745] that "[t]he social inconvenience of having to hunt for scarce parking spaces is not an environmental impact; the secondary effect of scarce parking on traffic and air quality *is*." (*Id.* at p. 697.) An EIR must "address the *secondary physical* impacts that could be triggered by a social impact. [Citation.]" (*Ibid.*, citing Guidelines, § 15131, subd. (a).)

However, the FEIR and its supporting document, namely, the traffic impact analysis, provide a detailed analysis of the parking impacts and demonstrate that there exists nearly three times more spaces than even the conservatively estimated demand. The analysis provides substantial evidence to support LAUSD's conclusion in the FEIR that there will be no significant parking impacts. (*Bakersfield, supra*, 124 Cal.App.4th at pp. 1197–1198; Guidelines, § 15384.)

Long Beach describes parking in the area as "scarce" and the spots as "coveted." It cites its comment that "school-generated parking demands in the residential area west of the project site *could* lead to parking restrictions that would force most student and visitor parking into the adjacent industrial area. . . ." (Italics added.) But substantial evidence includes " 'facts, reasonable assumptions predicated upon facts, and expert opinion supported by facts.' " (*Bakersfield, supra*, 124 Cal.App.4th at p. 1198, quoting § 21082.2, subd. (c); Guidelines, § 15384.)[15] Long Beach provided no facts to support its hypothesis that parking is scarce. But LAUSD did. As noted in its response,

---

[15] Long Beach asserts that at the LAUSD Board of Education regular meeting on April 24, 2007, LAUSD staff member McMillan contradicted the FEIR by stating, "We would be looking to continue the conversation with the City of Carson about mitigating park—parking impacts." Not only does this quote *not contradict* the FEIR's analysis and conclusions that there is ample available parking, but Long Beach has omitted the remainder of McMillan's statements in which he says, among other things, "We have done a careful and conservative assessment of the parking impact in the community, *and it is far less severe* than has been portrayed by the representatives of Carson and Long Beach here today." (Italics added.)

the consultants found more than three times the needed space available *within one-fourth of a mile of the school site*. Long Beach's supposition is unfounded.

### 4. *Land Use*

Long Beach contends that the FEIR fails to include analysis of land uses and omits discussion about whether the project is consistent with Long Beach's general plan in violation of Guidelines section 15125, subdivision (d).

Long Beach's general plan's land use element designates the project site as light industry where land is "strictly intended to be preserved as industrial employment opportunity areas and other, non-industrial uses are strongly discouraged." Long Beach's zoning code identifies the project site as medium industrial (IM). LAUSD's initial study noted that the project would have a "less than significant impact" with respect to conflicts with applicable land use plans because it expected the project to qualify for an administrative use permit. Then, LAUSD declared itself exempt from local zoning ordinances by passing a resolution rendering inapplicable Long Beach's zoning ordinance. (Gov. Code, § 53094, subd. (b).)[16]

Long Beach argues that LAUSD remains responsible for analyzing the project's consistency with Long Beach's *general plan* because "[z]oning ordinances are subservient to, and must be consistent with, general plans—not the reverse . . . ."

First, Long Beach misperceives the Guidelines when it challenges LAUSD for failing "to address the need for an analysis of the project's *consistency* with the Long Beach General Plan." (Italics added.) "[W]hile there is no requirement that an EIR itself be consistent with the relevant general plan, it must identify and discuss any *inconsistencies* between a proposed project and the governing general plan. [Citation.]" (*Napa Citizens for Honest Government v. Napa County Bd. of Supervisors* (2001) 91 Cal.App.4th 342, 360–361 [110 Cal.Rptr.2d 579], italics added, citing Guidelines, § 15125, subd. (d).) "Because EIRs are required only to evaluate

---

[16] Government Code section 53094, subdivision (b), reads: "Notwithstanding subdivision (a), the governing board of a school district, that has complied with the requirements of Section 65352.2 of this code and Section 21151.2 of the Public Resources Code, by a vote of two-thirds of its members, may render a city or county zoning ordinance inapplicable to a proposed use of property by the school district. The governing board of the school district may not take this action when the proposed use of the property by the school district is for nonclassroom facilities, including, but not limited to, warehouses, administrative buildings, and automotive storage and repair buildings."

'any *inconsistencies*' with plans, no analysis should be required if the project is *consistent* with the relevant plans. [Citation.]" (Kostka, *supra*, § 12.28, p. 605, italics added.)

LAUSD's responses explained that no inconsistency exists, with the result that it is not required to discuss the Long Beach general plan in the FEIR. The initial study considered possible inconsistencies between the project and the general plan and concluded there was a less than significant impact or conflict with any applicable land use plan, including a general plan. The initial study explained that the proposed project was "not expected to conflict with applicable land use plans" because "[t]he project site and land uses to the east and south are designated as Light Industry in the City of Long Beach General Plan Land Use Element." Long Beach's zoning code designates the area as IM. *Schools are permitted* in designated IM districts, the initial study explained, provided they meet applicable zoning criteria. After explaining that the project was expected to meet those criteria, the initial study concluded that the project "would . . . be compatible with adjacent uses" and that the commercial area to the east of the rail line extending to the 710 Freeway was "generally considered compatible with schools." Therefore, the initial study decided there was less than significant land use impact and so compatibility with Long Beach's general plan would not be analyzed in the EIR.

Long Beach commented that secondary schools are not identified as permitted uses in IM zoning districts. In its response, LAUSD pointed out that it had exercised its local zoning exemption power under Government Code section 53094 to "render a city or county zoning ordinance inapplicable to a proposed use of property by the school district." (Gov. Code, § 53094, subd. (b).)

In sum, because LAUSD explained how the proposed school would *not* conflict with the Long Beach general plan, and because the school district exercised its exemption power with respect to any possible conflict with Long Beach's zoning code, no inconsistencies exist and so the FEIR is not required to provide additional analysis. (*Napa Citizens for Honest Government v. Napa County Bd. of Supervisors, supra,* 91 Cal.App.4th at pp. 360–361, citing Guidelines, § 15125, subd. (d); Kostka, *supra,* § 12.28, p. 605.) Notwithstanding the lack of any obligation to discuss inconsistencies, the FEIR actually contains a seven-paragraph discussion about the Long Beach and Carson general plans and zoning ordinances in section 5.1, entitled "Environmental Effects Found Not to be Significant."

### 5. *Project Alternatives*

Long Beach contends that LAUSD fails to undertake a meaningful analysis of alternatives, with the result it fails as an informational document.

■ An EIR need not consider every conceivable alternative to a project. (Guidelines, § 15126.6, subd. (a).) The Guidelines require that the EIR "describe a range of reasonable alternatives to the project, or to the location of the project, which would feasibly attain most of the basic objectives of the project but would avoid or substantially lessen any of the significant effects of the project, and evaluate the comparative merits of the alternatives. An EIR . . . . must consider a *reasonable range of potentially feasible alternatives* that will foster informed decisionmaking and public participation. An EIR is not required to consider alternatives which are infeasible. The lead agency is responsible for selecting a range of project alternatives for examination and must publicly disclose its reasoning for selecting those alternatives." (Guidelines, § 15126.6, subd. (a), italics added.)

■ "CEQA establishes no categorical legal imperative as to the scope of alternatives to be analyzed in an EIR. Each case must be evaluated on its facts, which in turn must be reviewed in light of the statutory purpose. . . . [A]n EIR for any project subject to CEQA review must consider a reasonable range of alternatives to the project, *or to the location of the project*, which: (1) offer substantial environmental advantages over the project proposal (Pub. Resources Code, § 21002); and (2) may be 'feasibly accomplished in a successful manner' considering the economic, environmental, social and technological factors involved. [Citations.]" (*Citizens of Goleta Valley v. Board of Supervisors* (1990) 52 Cal.3d 553, 566 [276 Cal.Rptr. 410, 801 P.2d 1161], citing § 21061.1; Guidelines, § 15364.) Lead agencies are bound by the rule of reason: The Guidelines specify that "[t]here is no ironclad rule governing the nature or scope of the alternatives to be discussed other than the rule of reason. (Citizens of Goleta Valley v. Board of Supervisors[, supra,] 52 Cal.3d 553 and Laurel Heights Improvement Association v. Regents of the University of California[, supra,] 47 Cal.3d 376)." (Guidelines, § 15126.6, subd. (a), italics added.) "The alternatives shall be limited to ones that would avoid or substantially lessen any of the significant effects of the project." (Guidelines, § 15126.6, subd. (f).)

Long Beach contends first that the FEIR does not evaluate a reasonable range of alternatives. It argues that although the FEIR includes a "no project alternative," LAUSD "then includes a relabeled version of this same alternative (dubbed 'Continuation of Existing Use') under the guise of satisfying the requirement that the EIR analyze a range of alternatives." Hence, Long Beach argues the FEIR only considers two real alternatives to the project which, it contends, is not an adequate range. Stated otherwise, Long Beach appears to contend that the "no project alternative" and the "continuation of existing use" alternative are the same, with the result that the FEIR's *range* of alternatives is two.

Chapter 4 of the FEIR, entitled "Alternatives Analysis," discusses the following alternatives: expanding the existing Banning and Carson High Schools, developing a different type of school on the proposed site, and selecting among seven specific alternative sites for the project. LAUSD then selects and analyzes in further detail the alternatives of (1) not constructing the project, (2) continuing the existing use on the site, (3) reducing the project size, and (4) alternative sites. Each alternative was measured against the project's objectives. Even if the "no project alternative" is identical to the alternative of "continuing the existing use," LAUSD's FEIR contains analysis of a wider range of alternatives than merely the two cited by Long Beach. Otherwise, LAUSD is not required to consider alternatives that do not feasibly attain most of the basic objectives of the project or that would not avoid or substantially lessen any of the significant effects of the project. (Guidelines, § 15126.6, subd. (a).)

Long Beach's argument is unavailing that the trial court improperly placed on it, not the lead agency, the obligation to demonstrate better sites. LAUSD explained that the criteria used to generate and analyze the alternative sites came about after (1) holding four community meetings focused on site selection, alternative sites, and selection criteria; (2) reviewing site selection and alternative sites; (3) affording community input at its January 25, 2005 board meeting, and an augmented facilities committee meeting on January 27, 2005; and (4) applying the site selection criteria established by its facilities service division. Based on the information gathered there, the FEIR explains that each alternative site was infeasible or did not fulfill the project objectives because, inter alia, of the proximity to hazardous materials pipelines or an oil tank farm, the inability to meet certain state guidelines for schools, or to alleviate the demand for high school seats, and some locations were outside of LAUSD's boundaries or were in inappropriately close proximity to industrial uses. The FEIR also explains that the "no project alternative" was not feasible because it contravened the very purpose of constructing a new school by forcing students to continue to attend the overcrowded Banning and Carson High Schools.

Long Beach next argues that the alternatives analysis is conclusory and lacking in supporting evidence. It argues there is no explanation of the criteria used to generate the alternative sites and LAUSD's response to comments on this point is equally deficient.

 "The EIR shall include sufficient information about each alternative to allow meaningful evaluation, analysis, and comparison with the proposed project. A matrix displaying the major characteristics and significant environmental effects of each alternative may be used to summarize the comparison." (Guidelines, § 15126.6, subd. (d).) "An EIR must describe all reasonable

alternatives to the project [citation], including those capable of reducing or eliminating environmental effects; the specific alternatives of 'no project' must also be evaluated. [Citations.] The discussion of alternatives need not be exhaustive, and the requirement as to the discussion of alternatives is subject to a construction of reasonableness. The statute does not demand what is not realistically possible, given the limitation of time, energy and funds." (*Foundation for San Francisco's Architectural Heritage v. City and County of San Francisco* (1980) 106 Cal.App.3d 893, 909–910 [165 Cal.Rptr. 401]; see also *Preservation Action Council v. City of San Jose* (2006) 141 Cal.App.4th 1336, 1351 [46 Cal.Rptr.3d 902]; cf. § 21002.)

In our view, the FEIR's analysis of alternatives is sufficiently informative to satisfy CEQA. LAUSD made an objective, good faith effort to provide a meaningful analysis of the project's alternatives. It compared and contrasted the several project alternatives to allow meaningful evaluation, analysis and comparison. Chapter 4 contains 29 pages of discussion and analysis of alternatives, and includes a nine-page matrix. In addition to the analysis contained in the FEIR, LAUSD's response to comments added detailed information explaining the basis for its conclusion that the site chosen was the best alternative. CEQA requires neither that the EIR be perfect, nor that the analysis be exhaustive. (*Bakersfield, supra,* 124 Cal.App.4th at p. 1197.) At bottom, Long Beach's criticism is that six of the sites LAUSD rejected were located in Carson, whose population *in part,* the school is intended to serve, and the only sites deemed viable were those in Long Beach, whose residents will not attend the school. Yet courts do not " 'pass upon the correctness of the EIR's environmental conclusions, but only upon its sufficiency as an informative document.' [Citation.]" (*Laurel Heights, supra,* 47 Cal.3d at p. 392.)

██ As our Supreme Court explained in *Laurel Heights,* "A court may not set aside an agency's approval of an EIR on the ground that an opposite conclusion would have been equally or more reasonable. [Citation.] A court's task is not to weigh conflicting evidence and determine who has the better argument when the dispute is whether adverse effects have been mitigated or could be better mitigated. We have neither the resources nor scientific expertise to engage in such analysis, even if the statutorily prescribed standard of review permitted us to do so. Our limited function is consistent with the principle that 'The purpose of CEQA is not to generate paper, but to compel government at all levels to make decisions with environmental consequences in mind. CEQA does not, indeed cannot, guarantee that these decisions will always be those which favor environmental considerations.' [Citation.]" (*Laurel Heights, supra,* 47 Cal.3d at p. 393.) Long Beach has not demonstrated on appeal how LAUSD abused its discretion by failing to

proceed in a manner required by CEQA, or how its conclusions are unsupported by substantial evidence, or how this FEIR is insufficient as an information document.

## DISPOSITION

The judgment is affirmed. Appellant to bear the costs of appeal.

Klein, P. J., and Croskey, J., concurred.