Filed 1/30/2014

**CERTIFIED FOR PARTIAL PUBLICATION[*]**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| TRISHA LEE LOTUS et al.,<br><br>    Plaintiffs and Appellants,<br><br>v.<br><br>DEPARTMENT OF TRANSPORTATION et al.,<br><br>    Defendants and Respondents. | A137315<br><br>(Humboldt County<br>Super. Ct. No. CV110002) |

Appellants[1] appeal from a judgment denying their petition for a writ of mandate and injunctive relief challenging the sufficiency of an environmental impact report (EIR) approved by the State of California Department of Transportation (Caltrans). The project involved is highway construction to adjust the alignment of the approximately one-mile stretch of United States Route 101 that passes through Richardson Grove State Park (park). While we reject many of appellants' challenges to the adequacy of the EIR, we agree that the report is insufficient insofar as it fails to properly evaluate the significance of impacts on the root systems of old growth redwood trees adjacent to the roadway. Accordingly, we shall reverse the judgment and remand the matter for further proceedings.

---

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts one, two, and four of the Discussion.

[1] The appellants are Trisha Lee Lotus, Bruce Edwards, Jeffrey Hedin, Loreen Eliason, Environmental Protection Information Center, Center for Biological Diversity, and Californians for Alternatives to Toxics.

1

**Factual and Procedural History**

Richardson Grove State Park is home to redwood trees 300 feet tall and thousands of years old, of particular importance because of the high quality of the old growth redwood trees.[2] The park "is the first stand of old growth redwoods that travelers on US Route 101 pass through while on their northbound trek from San Francisco to Eureka and the Oregon Coast" and the "[m]assive old growth trees located immediately adjacent to the highway draw the full visual attention of all visitors who travel through this section of US Route 101."

As Route 101 passes through the park, it narrows to a two-lane road that curves tightly between the trees. The curves of the roadway and inadequate shoulder widths, among other things, do not meet current design standards. As a result, large vehicles traveling on this roadway find it difficult "to stay within the travel lane without using part of the opposing lane of traffic ('off-tracking') or traveling off the roadway and using the shoulders." Due to the current size and configuration of the road, industry standard-sized trucks authorized by the Surface Transportation Assistance Act of 1982 (STAA trucks) are prohibited from using this portion of Route 101.[3] This segment of roadway is the only portion of Route 101 that restricts access of STAA trucks into Humboldt County. According to Caltrans, this restriction prevents " 'businesses [in Humboldt County] from being profitable and competitive with other similar business along the west coast.' " Accordingly, the proposed project is designed "to adjust the roadway alignment to accommodate [STAA] truck travel, thereby removing the restriction for STAA vehicles, and improve the safety and operation of US Route 101 while also improving goods movement."

Caltrans issued a Notice of Preparation for an EIR in May 2008 and released the draft EIR (DEIR) on December 4, 2008. Following a public comment period, Caltrans

---

[2] An "old growth" redwood tree is defined in these proceedings as a tree with a diameter of 30 inches or more measured at four and a half feet above ground level.

[3] STAA trucks are slightly longer and configured differently than "California legal" trucks, which are authorized to use this stretch of highway.

released and certified the final EIR and approved the project on May 18, 2010. The Notice of Determination approving the EIR indicates that the project will not have any significant effect on the environment, but that mitigation measures have been made a condition of project approval and that a mitigation monitoring or reporting plan was adopted for the project.

The EIR describes the project as involving "minor road adjustments including realignments, curve corrections, and shoulder widening" as well as "culvert improvements and repaving the roadway." As relevant to this appeal, the primary environmental impacts resulting from the project are tree removal and potential damage to the structural root zones of other trees caused by, among other things, excavation and placement of impervious material or fill over the roots.[4]

Focusing on the "community" of redwood trees as a whole, rather than on individual trees, the EIR provides summary information regarding the project's environmental impacts. No old growth redwood trees will be removed. Only six redwood trees ranging in size from four to nineteen inches in diameter will be removed. "Within the project limits, there would be construction activities that occur within the structural root zone of approximately 74 redwood trees ranging in diameter from 18 inches to 15 feet." With respect to impacts to old growth redwood trees caused by fill, the EIR states: "About 41 redwood trees thirty inches or greater in diameter within the park would have fill placed within the structural root zone. The maximum depth of fill on these redwoods would be three and a half feet. Of those redwood trees affected by fill, about 50 percent would have fill of six inches or less and over 70 percent would have fill of 12 inches or less." With respect to impacts to old growth redwood trees caused by excavation (or cuts), the EIR states: "It is estimated that construction excavation would occur within the structural root zone of 58 redwood trees thirty inches in diameter or

---

[4] The EIR explains that the structural root zone of a tree "is a circular area with the tree trunk at the center and a radius equal to three times the diameter of the tree trunk measured at breast height (4.5 feet above ground level)." The "root health zone" extends in a slightly larger circle with a radius five times the diameter of the tree trunk.

greater within the park. The maximum depth of the excavation within the structural root zone of redwoods thirty inches in diameter or greater within the park is two feet. Nearly thirty percent of these redwood trees affected would experience excavation of six inches or less." With regard to placement of impervious roadway materials, the EIR states: "The proposed realignments would require locating the roadbed nearer to some trees and locating it further from other trees and removing the existing pavement. An additional 0.30 acres of impervious surface would be placed overall within the project limits. Of this, 0.14 acre of roadbed material would be placed within the structural root zone area of trees. This represents a nearly five percent increase in the total amount of hardened surface (roadbed) within the structural root zone area of trees within the project limits including both within the boundaries of the park and outside the park."

The EIR also describes "avoidance, minimization and/or mitigation measures" that "have been incorporated into the project to avoid and minimize impacts as well as to mitigate expected impacts." These include, "M-l: Restorative planting of 0.56 acre of former US Route 101 roadbed alignment. . . . [¶] M-2: To offset the impacts to the trees where construction occurs within the structural root zone, mitigation will be provided to increase the amount of invasive plant removal. A contract with the California Conservation Corps will be established to provide 300 hours a year for four years (three days each year for a crew of twelve, the minimum crew size). Crew to be directed at the discretion of the California Department of Parks and Recreation." In addition, the following "avoidance and minimization measures" will be implemented for work in the park: "[1] An arborist shall be present to monitor any ground disturbing construction activities. [¶] [2] All excavation below the finish grade within a setback equal to three times the diameter of any redwood trees shall be done with shovels, pick axes, or pneumatic excavator or other methods approved by the construction engineer to minimize disturbance or damage to the roots with the exception of culvert work at PM 1.18, 1. 28, 1.34 and 1.35. Mechanized equipment can be used at these locations upon approval of the construction engineer. [¶] [3] The contractor will be required to use a pneumatic excavator (such as an air spade) while excavating the soil within the structural root zone

4

of redwood trees to minimize physical injury to the tree roots. [¶] [4] Smaller roots less than 2 inches in diameter that must be cut shall be cut cleanly with sharp instrument in order to promote healing. [¶] [5] The structural section for new pavement shall consist of Cement Treated Permeable Base (CTPB) to minimize the thickness of the structural section, provide greater porosity, minimize compaction of roots, and minimize thermal exposure to roots from Hot Mix Asphalt paving. [¶] [6] After construction, the . . . cut-slope area between PM 1.35 and PM 1.37 will be replanted. After tree removal, but prior to excavation of the cut-slope areas, the upper four to six inches of duff and native soil (topsoil) will be set aside for placement on finished fill slopes to provide the nutrients and a seed bank for natural revegetation. [¶] [7] To help minimize potential stress on the redwood trees during construction, watering will be provided. In areas where roadway excavation will take place below the finish grade within the structural root zone of redwoods 30 inches in diameter or larger, watering equivalent to 1/2 inch depth to an area defined as from the edge of existing pavement to 25 feet beyond the edge of pavement shall be performed. Watering to be performed not more than 24 hours after the roadway excavation work at a site and shall occur weekly thereafter between the dates of June 1st and September 30th. [¶] [8] Caltrans will adhere to the California Department of State Parks and Recreation Commission Statement of Policy (Policy 11.4) which states, 'In order to maintain the genetic integrity and diversity of native California plants, all transplant and propagation in the North Coast Redwoods District will be from the local populations (preferably from within the same stand). For the purpose of this policy, local is defined as being [from] the immediate project area (as close as possible, but generally less than one mile).' [¶] [9] In areas where new embankment is to be constructed to protect roots and promote air circulation the following measures shall be used: [¶] [a] Any duff layer shall be raked off the area within the clearing limits, stored, and replaced as erosion control. For areas within the structural root zone of redwoods thirty inches in diameter and greater, the duff will be hand raked. [¶] [b] A 0.75 foot thick layer of Class 1, Type A permeable material shall be placed and compacted as the first lift of the fill to increase water infiltration and air circulation. (In areas next to the shoulder hinge point it

5

might not be possible to provide this much depth. In those cases, as much as feasible will be placed.) [¶] [c] In locations where ≥ 4 inches of fill would be placed next to the trunk of a tree ≥ 18 inches in diameter, a brow log shall be used to keep the soil from the tree trunk to increase air circulation."

Ultimately, the EIR concludes that "[n]o significant environmental impacts are expected as a result of this project with the implementation of the stated special construction techniques."

On June 17, 2010, appellants filed their Petition for Writ of Mandate and Injunctive Relief. The trial court initially issued an order finding in favor of Caltrans on most issues but noting that "Caltrans may not have complied with [Public Resources Code section 21000, et seq. (California Environmental Quality Act or CEQA)] in adopting mitigation measures." The court explained, "if a project will have a significant effect, one way to comply with CEQA is to incorporate measures into the project that would 'avoid or substantially lessen the significant environmental effect . . . .' [Citations.] An agency adopting such mitigation measures, however, must also adopt a 'reporting or monitoring program' that is 'designed to ensure compliance during project implementation.' [Citations.] [¶] The fact of the matter is that Caltrans has adopted mitigation measures, some of which are labeled 'special construction techniques.' [Citation.] More important, Caltrans's finding of no significant environmental effects is explicitly premised on mitigation measures; namely 'the implementation of stated special construction techniques.' [Citation.] [¶] The Court does not believe that Caltrans violated CEQA simply by taking into account mitigation measures in making its determination that no significant effects will occur. It seems perfectly appropriate and realistic for an agency in a case like this and in many others to: (1) be uncertain as to whether a project, without mitigation, will have a 'significant effect' within the meaning of CEQA (a fundamentally vague standard that this Court admits it had considerable difficulty applying); and (2) be entirely certain that a project will not have a significant effect if appropriate mitigation measures are adopted. [Fn. omitted.] [¶] But where, as here. an agency decides to incorporate mitigation measures into its significance determination,

6

and relies on those mitigation measures to determine that no significant effects will occur, that agency must treat those measures as though they were required, i.e., the agency must treat those measures as though they were adopted following a finding of significance in accordance with CEQA Guidelines section 15091(a)(1) and Public Resources Code section 21081(a)(1). The Court will not punish Caltrans for taking into account its mitigation measures when making its significance determination, but at the same time the Court will not provide Caltrans a shortcut to CEQA compliance by allowing Caltrans to rely on mitigation measures that have not been adequately adopted." (Italics omitted.) Accordingly, the court ordered Caltrans to show cause as to whether it had adopted a mitigation monitoring or reporting program as required by CEQA.

Caltrans filed a response to the order to show cause on August 11. Although much of the submission was ruled inadmissible, the court ultimately concluded, based on evidence contained in the administrative record, that Caltrans had adopted a sufficient mitigation monitoring program. Among other things, the court relied on the Environmental Commitments Record for the proposed project, which is a tool used by Caltrans "to track the project specific environmental commitments for a given project," as well as Caltrans's assurances in response to comments on the draft EIR that "[t]he minimization measures would be incorporated into the contract plans and specifications." Accordingly, the trial court issued an order denying the petition for writ of mandate and this appeal timely followed.

## Discussion

"In a mandate proceeding to review an agency's decision for compliance with CEQA, we review the administrative record to determine whether the agency abused its discretion. [Citation.] 'Abuse of discretion is shown if (1) the agency has not proceeded in a manner required by law, or (2) the determination is not supported by substantial evidence.' [Citation.] 'When the informational requirements of CEQA are not complied with, an agency has failed to proceed in "a manner required by law" and has therefore abused its discretion.' [Citation.] Furthermore, 'when an agency fails to proceed as required by CEQA, harmless error analysis is inapplicable. The failure to comply with

7

the law subverts the purposes of CEQA if it omits material necessary to informed decisionmaking and informed public participation. Case law is clear that, in such cases, the error is prejudicial.' [Citation.] [¶] 'In reviewing an agency's decision to certify an EIR, we presume the correctness of the decision. The project opponents thus bear the burden of proving that the EIR is legally inadequate.' [Citation.] However, '[w]hile we may not substitute our judgment for that of the decision makers, we must ensure strict compliance with the procedures and mandates of the statute.' [Citation.]" (*State Water Resources Control Bd. Cases* (2006) 136 Cal.App.4th 674, 723.)

1.      *The EIR adequately describes the project's environmental setting.*

California Code of Regulations, title 14, section 15125 provides in relevant part, "(a) An EIR must include a description of the physical environmental conditions in the vicinity of the project, as they exist at the time the notice of preparation is published, or if no notice of preparation is published, at the time environmental analysis is commenced, from both a local and regional perspective. This environmental setting will normally constitute the baseline physical conditions by which a lead agency determines whether an impact is significant. The description of the environmental setting shall be no longer than is necessary to an understanding of the significant effects of the proposed project and its alternatives. [¶] . . . [¶] (c) Knowledge of the regional setting is critical to the assessment of environmental impacts. Special emphasis should be placed on environmental resources that are rare or unique to that region and would be affected by the project." (Cal. Code Regs., tit. 14, § 15125.)[5]

Appellants contend the EIR's description of the project's environmental setting fails to comply with the requirements of CEQA because it "failed to fully describe the most critical aspect of the Project's environmental setting: the nature, location, and extent of each old-growth redwood root zone that would be affected by the Project." We disagree.

---

[5] All future references to California Code of Regulations, title 14, section 15000 et seq. will be denoted "Guidelines."

The EIR describes the natural plant community within the park as "predominately Redwood series, dominated by an overstory of large redwood trees." The EIR emphasizes that "[a]lthough the California Native Plant Society Inventory does not include redwoods, it is a species that commands respect in and of themselves . . . ." Table 8 in the EIR identifies by size and type each of the 54 trees, including the six redwood trees that will be removed; Table 9 identifies additional trees by size and type, including 74 redwood trees the structural root zones of which are located within the project area. The EIR includes maps showing the location of trees identified in these tables and the proposed modifications to Route 101. Accordingly, the EIR amply sets out the environmental setting of the proposed project.

The cases relied on by appellants are distinguishable. In *Galante Vineyards v. Monterey Peninsula Water Management. Transit Dist.* (1997) 60 Cal.App.4th 1109, 1114, 1122, the description of the environmental setting was found to be inadequate where the EIR for a proposed dam contained only one passing reference to vineyards in the project area although there were "numerous vineyards" in the vicinity that were part of a "thriving" industry. Likewise, in *San Joaquin Raptor/Wildlife Rescue Center v. County of Stanislaus* (1994) 27 Cal.App.4th 713, 718, 722-29, the environmental setting description was found to be inadequate because it "completely fail[ed] to mention and consider a nearby wetland wildlife preserve." (*Id.* at p. 725.) As the trial court here noted, "[t]he present case would be like *Galante Vineyards* and *San Joaquin Raptor/Wildlife* if Caltrans had completely omitted any discussion of the old-growth redwoods, or made one passing reference to the effect of, 'By the way, some old-growth redwoods are also present.' That is not what happened."

2.      *The EIR adequately describes the scope of the project.*

CEQA Guidelines section 15124 provides in relevant part: "The description of the project shall contain the following information but should not supply extensive detail beyond that needed for evaluation and review of the environmental impact. [¶] (a) The precise location and boundaries of the proposed project shall be shown on a detailed map, preferably topographic. The location of the project shall also appear on a regional map.

9

[¶] (b) A statement of the objectives sought by the proposed project. A clearly written statement of objectives will help the lead agency develop a reasonable range of alternatives to evaluate in the EIR and will aid the decision makers in preparing findings or a statement of overriding considerations, if necessary. The statement of objectives should include the underlying purpose of the project. [¶] (c) A general description of the project's technical, economic, and environmental characteristics, considering the principal engineering proposals if any and supporting public service facilities." "An accurate, stable and finite project description is the *sine qua non* of an informative and legally sufficient EIR." (*County of Inyo v. City of Los Angeles* (1977) 71 Cal.App.3d 185, 193.) "Only through an accurate view of the project may affected outsiders and public decision-makers balance the proposal's benefit against its environmental cost, consider mitigation measures, assess the advantage of terminating the proposal (i.e., the 'no project' alternative) and weigh other alternatives in the balance." (*Id.* at pp. 192-193.)

As described in the EIR, the project involves "minor road adjustments including realignments, curve corrections, and shoulder widening to accommodate STAA truck travel, thereby removing the restriction of STAA vehicles, and improving the safety and operation of US Route 101 while also improving goods movement. The project also includes culvert improvements and repaving the roadway." The specific proposed modifications to the roadway are depicted on several maps and sufficiently described in the final EIR.

The EIR explains that the project consists of three segments. In the first, "there would be minor realignments of the existing roadway to minimize off-tracking conflicts between large vehicles and fixed objects (trees). Two 12-foot lanes with 2-foot shoulders are proposed where possible. This work would require minor earthwork, sliver widening of the roadway and adjustments to the super-elevation (to 'bank the curves'). The maximum lateral change in the alignment would be 17 feet, but the average alignment shift from the existing centerline would be approximately 2 to 6 feet." There will be three main areas of cut and fill; one cut of approximately 300 cubic yards and two fills each with approximately 200 cubic yards. "The roadway in this segment would be slightly

10

widened to provide for two foot shoulders where possible. Proposed shoulders would be tapered where existing trees are located adjacent to the edge of pavement." In addition, three existing culverts would be replaced or expanded. In the second segment, proposed work only "involves removing and replacing the existing open graded pavement and striping, and extending a berm to divert water into a downdrain to connect to [an existing culvert]. There are no STAA restrictions in this segment, so no realignment or widening is proposed." The final segment "involves widening the roadway to provide for wider shoulders, and realigning the roadway to minimize off-tracking conflicts between large vehicles and fixed objects. The majority of this segment is located outside the park boundary . . . ." A portion of the "proposed alignment would be shifted approximately ten feet into an existing cut slope west of the highway." The remainder of the "proposed alignment would be shifted slightly to the east. A 200-foot long soldier pile retaining wall would be constructed that would support the roadway from below the road." [6]

Contrary to appellants' argument, further clarification regarding "how [Caltrans] used the 'Autoturn' program to design the Project," including information about "the design considerations necessary to reconfigure the highway for STAA access" or "the software's characteristics or assumptions or the inputs Caltrans used to design the Project" is not required by CEQA. CEQA requires only "a 'general description' of the project's technical characteristics. 'General' means involving only the main features of something rather than details or particulars. [Citation.] The 'general description' requirement for the technical attributes of a project is consistent with other CEQA mandates to make the EIR a user-friendly document." (*Dry Creek Citizens Coalition v. County of Tulare* (1999) 70 Cal.App.4th 20, 28.) The EIR in this case strikes the desired "balance between technical accuracy and public understanding." (*Ibid*.) The additional technical information sought by appellants is not necessary to allow the public and

---

[6] Contrary to appellants' argument, the project description did not change significantly between the draft and final EIR. While some changes were made, particularly with regard to placement of the retaining wall, none significantly changed the scope or purpose of the project. That more trees were identified as suffering root zone impacts in the final EIR than in the draft EIR does not establish a significant alteration of the project description.

decision-makers to fully understand the environmental consequences of the project. Indeed, inclusion of this additional technical information would be inconsistent with the directive in Guideline 15124 that the project description not supply "extensive detail beyond that needed for evaluation and review of the environmental impact."

3.    *The EIR fails to comply with CEQA insofar as it fails to evaluate the significance of the project's impacts on the root systems of old growth redwood trees adjacent to the roadway.*

CEQA requires that an EIR include, among other things, a detailed statement setting forth "[a]ll significant effects on the environment of the proposed project" and "[m]itigation measures proposed to minimize significant effects on the environment." (Pub. Resources Code, § 21100, subd. (b); see also Guidelines, § 15126 ["Significant Environmental Effects of the Proposed Project" and "The Mitigation Measures Proposed to Minimize the Significant Effects" shall be discussed "preferably in separate sections or paragraphs of the EIR."].) "For each significant effect, the EIR must identify specific mitigation measures; where several potential mitigation measures are available, each should be discussed separately, and the reasons for choosing one over the others should be stated." (*Sacramento Old City Assn. v. City Council* (1991) 229 Cal.App.3d 1011, 1027.) If the EIR identifies significant environmental effects, the public agency may approve the project only if it makes one or more of the following findings:  "(a). . . [¶] (1) Changes or alterations have been required in, or incorporated into, the project which mitigate or avoid the significant effects on the environment.  . . . [¶] (3) Specific economic, legal, social, technological or other considerations . . . make infeasible the mitigation measures or project alternatives identified in the environmental impact report." (Pub. Resources Code, § 21081; *Sacramento Old City Assn. v. City Council, supra,* 229 Cal.App.3d at p. 1034.) These findings must be made for each identified significant effect "accompanied by a brief explanation of the rationale for each finding." (Guidelines, § 15091.)

In *Village Laguna of Laguna Beach, Inc. v. Board of Supervisors* (1982) 134 Cal.App.3d 1022, the court explained the importance of these procedural steps and

findings: "[T]he purposes of section 21081 are that there be some evidence that the alternatives or mitigation measures in the EIR actually were considered by the decision making agency and, as the Supreme Court stated in a similar situation, that there be a disclosure of 'the analytic route the . . . agency traveled from evidence to action.' [Citations.] Thus, when a project is approved that will significantly affect the environment, CEQA places the burden on the approving agency to affirmatively show that it has considered the identified means of lessening or avoiding the project's significant effects and to explain its decision allowing those adverse changes to occur. [¶] . . . [¶] . . . Only by making this disclosure can others, be they courts or constituents, intelligently analyze the logic of the board's decision." (*Id.* at pp. 1034-1035.)

As quoted extensively above, the EIR in this case contains information regarding the overall impacts on the community of redwood trees. Though somewhat less clearly presented, the EIR also contains information about project activity that will take place within the root zones of specific old growth redwood trees. For example, Table 10 shows the cut and fill depths for each old growth redwood tree in the project area. With this data, it is possible to identify the trees that will be subject to the most cut or fill work and plot them on the map to determine the location of the tree in relation to the proposed roadway modifications. It is also possible using the data available in the EIR (Table 8) to calculate the square footage of the root zones and determine what percentage of the root zone will be impacted by the cut and fill work. The EIR also indicates the changes that will result in the impermeable area covering the root zones of some of the old growth redwood trees, both in terms of the number of square feet and as a percentage of the total square footage of the root zone. The EIR does not, however, include any information that enables the reader to evaluate the significance of these impacts.

Appellants suggest that the proper measure of significance is found in the State Parks Natural Resources Handbook ("handbook"), which includes information for safeguarding protected trees when planning for construction. According to the handbook, "Construction activities in close proximity to trees can wound or destroy tree roots, the closer the activity to the tree trunk, the higher the probability that the tree will suffer

13

injury. This includes soil disturbance from 0 to 3 foot depth including trenching, grade changes, storage of vehicles and materials, or compaction caused by machinery traversing the zone. . . .[¶] . . .[¶]  There should be no construction activities in the Structural Root Zone of a protected tree. This includes soil disturbance from 0 to 3 foot depth including trenching, grade changes, storage of vehicles and materials, or compaction caused by machinery traversing the zone. Any intrusion into this zone is usually accompanied by significant injury to roots further from the trunk; this will shorten the useful life of the tree in the developed area by reducing vigor and introducing root disease. Furthermore, damage to any structural roots may cause an already structurally compromised tree to become hazardous (i.e., a high risk of uprooting). [¶] There should be no intrusion beneath the dripline for a protected tree which has pre-existing structural root loss." Finally, the handbook offers guidelines for determining how much impact or damage "a protected tree . . . can endure and easily recover from." "For example, a young vigorously growing tree with no existing damage could likely survive a 30% loss of non-structural roots, or a 30% loss of foliage or some combination of these [two] impacts totaling ≤ 30%." In contrast, an old tree in poor health that has already suffered a loss of 10% of its root health zone, according to the handbook, could not easily survive further impacts.

Caltrans implicitly acknowledges the value of the handbook in its appellate brief, citing it for the statement that "even the most low vigor trees can lose 10% of the roots from their 'root health zones' [fn. omitted] without a significant loss in health. [Fn. omitted.]" The EIR itself, however, does not reference the handbook or apply the standards it prescribes to evaluate impacts to the old growth redwoods that may be expected to result from the highway construction.  In fact, the EIR fails to identify any

14

standard of significance, much less to apply one to an analysis of predictable impacts from the project. [7]

Caltrans compounds this omission by incorporating the proposed mitigation measures into its description of the project and then concluding that any potential impacts from the project will be less than significant. As the trial court held, the "avoidance, minimization and/or mitigation measures," as they are characterized in the EIR, are not "part of the project." They are mitigation measures designed to reduce or eliminate the damage to the redwoods anticipated from disturbing the structural root zone of the trees by excavation and placement of impermeable materials over the root zones. By compressing the analysis of impacts and mitigation measures into a single issue, the EIR disregards the requirements of CEQA. (See Pub. Resources Code, §§ 21100, subd. (b), 21081; Guidelines, §§ 15126, 15091; *Sacramento Old City Assn. v. City Council, supra,* 229 Cal.App.3d*; Village Laguna of Laguna Beach, Inc. v. Board of Supervisors, supra*,

---

[7] We do not suggest that the handbook is the only or necessarily the best measure for determining significance. The standard of significance applicable in any instance is a matter of discretion exercised by the public agency "depending on the nature of the area affected." (*North Coast Rivers Alliance v. Marin Municipal Water District Board of Directors* (2013) 216 Cal.App.4th 614, 624.) "The determination of whether a project may have a significant effect on the environment calls for careful judgment on the part of the public agency involved, based to the extent possible on scientific and factual data." (Guidelines, § 15064, subd. (b); see also Guidelines, § 15064.7, subd. (a) ["Each public agency is encouraged to develop and publish thresholds of significance that the agency uses in the determination of the significance of environmental effects. A threshold of significance is an identifiable quantitative, qualitative or performance level of a particular environmental effect, non-compliance with which means the effect will normally be determined to be significant by the agency and compliance with which means the effect normally will be determined to be less than significant"].)

134 Cal.App.3d.)[8] The EIR fails to indicate which or even how many protected redwoods will be impacted beyond the tolerances specified in the handbook and, by failing to indicate any significant impacts, fails to make the necessary evaluation and findings concerning the mitigation measures that are proposed. Absent a determination regarding the significance of the impacts to the root systems of the old growth redwood trees, it is impossible to determine whether mitigation measures are required or to evaluate whether other more effective measures than those proposed should be considered. Should Caltrans determine that a specific tree or group of trees will be significantly impacted by proposed roadwork, that finding would trigger the need to consider a range of specifically targeted mitigation measures, including analysis of whether the project itself could be modified to lessen the impact. (*Lincoln Place Tenants Assn. v. City of Los Angeles* (2007) 155 Cal.App.4th 425, 445 ["CEQA requires lead agencies to include within EIR's potentially feasible alternatives that, if adopted, would avoid or substantially lessen the otherwise significant environmental effects of the proposed projects. In particular, mitigation measures should be capable of '[a]voiding the impact altogether by not taking a certain action or parts of an action'; '[m]inimizing impacts by limiting the degree or magnitude of the action and its implementation'; '[r]ectifying the impact by repairing, rehabilitating, or restoring the impacted environment'; 'or [r]educing or eliminating the impact over time by preservation and maintenance operations during the life of the action.' "]; Guidelines, § 15370.) The finding also triggers the need to adopt an enforceable monitoring program. (Guidelines, § 15091, subd. (d).) Simply stating that

---

[8] The distinction between elements of a project and measures designed to mitigate impacts of the project may not always be clear. For example, in the present case the use of "Cement Treated Permeable Base (CTPB) to minimize the thickness of the structural section, provide greater porosity, minimize compaction of roots, and minimize thermal exposure to roots from Hot Mix Asphalt paving" might well be considered to define the project itself. It would be nonsensical to analyze the impact of using some other composition of paving and then to consider use of this particular composition as a mitigation measure. However, the same cannot be said of most of the "avoidance, minimization and/or mitigation measures" here, such as the restorative planting and replanting, invasive plant removal, and use of an arborist and of specialized equipment. These are plainly mitigation measures and not part of the project itself.

16

there will be no significant impacts because the project incorporates "special construction techniques" is not adequate or permissible.

The two expert opinions cited in the EIR, both of which conclude that the project will have no significant impact on the root health of the redwoods, suffer from the same deficiency. Both fail to discuss the significance of the environmental impacts apart from the proposed "avoidance, minimization and/or mitigation measures" and thus fail to consider whether other possible mitigation measures would be more effective.

This structural deficiency in the EIR was brought to the attention of Caltrans but was disregarded. A letter from the California Department of Parks and Recreation commenting on the draft EIR advised Caltrans, "After careful review, the North Coast Redwoods District has identified several inconsistencies in the DEIR and there is a general lack of data or information that is necessary for our staff to make qualified determinations as to the impact to the State Park resources, and the viability of the mitigation measures that are presented. . . . Several sections of the DEIR are not consistent with CEQA for which we believe additional analysis or mitigation measures need to be developed. The document also contains numerous mitigation measures that are not enforceable and are therefore not compliant with CEQA. [¶] Because of the apparent inconsistencies, lack of clear mitigation methods and a lack of sufficient data to evaluate the proposed project, we are not able to make a determination on some critical aspects of the project's impact to the State Park. We are concerned that the document does not meet its requirement to be an enforceable environmental tool." The letter specifically warns, "[T]he DEIR states that the proposed action will not result in any significant adverse effects to the environment and that no mitigation measures are proposed. These statements conflict with many of the Environmental Consequences sections of this document . . . . The DEIR also contains mitigation measures which are not acknowledged in this section but are described in Appendix D. These measures need to be listed in this section and the CEQA checklist needs to be corrected to indicate that significant adverse effects will occur and then determine if those measures are adequately mitigated. The DEIR also contains other measures that should be listed as mitigation but which will only

be done at the discretion of the contractor. These need to be measurable and enforceable and listed as mitigations." Despite Caltrans's assurance that "[t]he final document will be revised to identify the avoidance and minimization mitigation measures," the final EIR fails to do so.[9] As succinctly summarized by the Board of Directors of the Save the Redwood League, "the level and format of environmental review made it extremely difficult to fully comprehend and assess the project."

The failure of the EIR to separately identify and analyze the significance of the impacts to the root zones of old growth redwood trees before proposing mitigation measures is not merely a harmless procedural failing. Contrary to the trial court's conclusion, this short-cutting of CEQA requirements subverts the purposes of CEQA by omitting material necessary to informed decision-making and informed public participation. It precludes both identification of potential environmental consequences arising from the project and also thoughtful analysis of the sufficiency of measures to mitigate those consequences. The deficiency cannot be considered harmless. For this reason, we must reverse the denial of the petition for a writ of mandate and remand the case for issuance of a writ directing Caltrans to set aside its certification of the final EIR pending modification of those portions of the EIR discussing impacts on old growth redwood trees and proposed mitigation measures in compliance with CEQA. (Pub. Resources Code, § 21168.9)

Caltrans is not required to start the EIR process anew. Caltrans need only correct the deficiencies we have identified before considering recertification of the EIR. Whether the correction requires recirculation of the EIR is for Caltrans to decide in light of the

---

[9] At oral argument, counsel for Caltrans argued that a subsequent letter, dated November 18, 2009, from the Department of Parks and Recreation, confirming compliance with requirements for federally-aided highway projects, indicates that the deficiencies in the EIR had been corrected. In this letter the department "accept[ed] that [Caltrans] has concluded there is currently no feasible and prudent alternative to the proposed realignment through Richardson Grove State Park" and agreed "that the proposed realignment action has included all possible planning by [Caltrans] to minimize long term harm to Richardson State Park Resources." However, the letter does not indicate that the information necessary to evaluate this conclusion has been properly included in the EIR.

18

standards governing recirculation of an EIR prior to certification. (Pub. Resources Code, § 21092.1; Guidelines, § 15088.5.) [10]

4.    *Analysis of cumulative traffic impacts from other Caltrans projects was not required.*

CEQA defines a cumulative impact as "an impact which is created as a result of the combination of the project evaluated in the EIR together with other projects causing related impacts" and requires that an EIR "discuss cumulative impacts of a project when the project's incremental effect is cumulatively considerable." (Guidelines, § 15130, subd. (a).) However, "[a]n EIR should not discuss impacts which do not result in part from the project evaluated in the EIR." (Guidelines, § 15130, subd. (a)(1).)

Caltrans argues that no discussion of cumulative traffic impacts was necessary in light of the conclusion in the EIR that the project will not result in an increase in commercial traffic. In discussing the environmental impacts of the project on population growth, the EIR concludes that the project will not increase truck traffic in Humboldt County. The EIR provides, "Caltrans commissioned a study in 2008 in order to assess the disadvantages and potential growth impacts. The study, "Realigning Highway 101 at Richardson Grove: The Economic Impact on Humboldt and Del Norte Counties" (Dr. David Gallo, March 2008) found that transportation costs are currently higher within these counties due to STAA restrictions, however, the removal of these restrictions would not be expected to result in an increase in truck traffic, rather an increase in efficiency. The study cites information from business owners in the region who estimated a reduction in the number of annual truck trips of 12.3 percent if the STAA restrictions through Richardson Grove were 1ifted. The reduction in the number of trips due to increased efficiency would likely offset any increase in number of trips due to reduced transportation costs, with a result that eliminating STAA restrictions in southern

[10] With the exception of the cumulative impacts section discussed *post,* in light of the remand, we do not reach appellants' remaining arguments.

19

Humboldt County would not significantly change truck traffic. [¶] Another reason why STAA truck traffic is not likely to substantially increase in Humboldt County is due to the types of industr[ies] utilizing trucking as a primary goods movement method. A report prepared by Caltrans for the California Senate Transportation Committee titled, "A Study of Various Aspects of Tractor-Semi-trailer Productivity" (January 1986) examined the comparative economic value of STAA trucks' greater volume. The study analyzed the theory that longer trailers constituted a substantial economic advantage in terms of hauling volume. The study concluded that, when maximum weight is a criterion, the 48-foot semi-trailers allowed under the STAA regulations 'are more productive only for high-cube (low density) freight. They are usable for heavier products but, for such goods, are no more productive tha[n] the shorter non-STAA trailers.' Meaning, that there is a maximum weight restriction for loads as well as maximum length of cabs and trailers, and that for heavy loads, the economic advantage for the longer vehicles is not present because STAA trucks are subject to the same weight restriction as non-STAA trucks. [¶] Additionally, the total number of trucks utilizing US Route 101 would not be likely to change regardless of truck size for routine truck trips, regardless of the vehicle's volume or the payload's weight (for instance, weekly or biweekly deliveries from distribution centers to retail outlets). Increasingly, businesses rely upon products delivered to the customer "just in time" rather than warehoused items. Trips of this kind would not likely be affected by the proposed project. This is particularly true in light of economic trends. Truck transport has been declining nationwide with the rise in fuel prices and many firms are requiring full return payloads in order to maximize fuel economy. [¶] It is not likely that truck traffic would be diverted from the 1-5 corridor to use US Route 101 if the STAA restriction is lifted. Diversion onto US Route 101 would depend upon it being economically feasible for the trucking companies to change their existing routes based upon fuel consumption and travel times. Since all the major coastal cities from southern California to northern Washington have readily available access to the 1-5 and Route 99

20

corridors, which have straighter alignments and faster travel times, the opening of STAA access to US Route 101 through Richardson Grove is not expected to generate a substantial amount of diverted truck traffic. In addition, a traffic study performed for the projects to lift STAA restrictions on Routes 197 and 199 in Del Norte County [fn. omitted] also found that there was very little latent demand [fn. omitted] expected with the removal of the STAA restriction. That study estimated that providing STAA access could add about eight truck round trips per day on Routes 199 and 197."

Appellants argue that discussion of cumulative traffic impacts was required because Caltrans knew that the effects of the project, although minor themselves, may be significant when combined "with other Caltrans STAA truck access projects planned and currently underway in Northern California." We disagree that the evidence cited by appellants supports such a conclusion.

Appellants cite to a comment by a Caltrans staffer in response to a draft of the Richardson Grove Natural Environment Study in which she identifies "several STAA Curve improvement projects that have recently been completed, or are planned in Humboldt and Del Norte Counties" that "may increase commercial traffic levels." Appellants also cite to an email by another Caltrans staffer in which she notes that there are changes in motion to allow use of STAA trucks on state highways in Humboldt and Del Norte Counties and that the "shifting of Cal-Legal and STAA-configured truck modes may cause some shifting of travel paths for some truckloads entering and leaving Humboldt and Del Norte Counties." Unlike the EIR quoted extensively above, neither comment offers any additional analysis of these potential impacts.

Appellants rely on a prediction found in the traffic study for the Highway 197/199 STAA project, cited in the EIR, which estimates that in the year 2030 there will be approximately 46 round-trips, or 92 more trucks, per day using the SR-199 and US-197 corridors than under the no build scenario. That same report concludes, however, "[t]he Del Norte STAA improvements project is not expected to significantly increase truck

21

volumes on US-199, SR-197 or US-101. The [level of service] on US-101, US-199, and SR-197 are within the acceptable thresholds . . . for existing and future 2030 background conditions. . . . [¶] . . . While the project is expected to attract additional trucks to US-199 and SR-197, the increase in truck traffic will not have a significant negative impact on traffic operations, transit operations, or the bicycle/pedestrian environment." Contrary to appellants' argument, the report does not conclude that these two STAA access projects, both of which have insignificant impacts on traffic, will have a significant cumulative impact.

## Disposition

The judgment is reversed and the matter is remanded to the trial court with directions to enter a new judgment, consistent with Public Resources Code section 21168.9 and this opinion, granting plaintiffs' petition for a writ of mandate. Appellants shall recover their costs on appeal.

_____
Pollak, J.

We concur:

_____
McGuiness, P.J.

_____
Jenkins, J.

22

Trial Court:                                       Humboldt County Superior Court

Trial Judge:                                     Hon. Dale A. Reinholtsen

Counsel for Plaintiffs and Appellants:        Center for Biological Diversity:
  Kevin P. Bundy

Cotchett, Pitre & McCarthy:
  Joseph W. Cotchett,
  Philip L. Gregory
    and
  Paul N. McCloskey

Gross Law:
  Stuart G. Gross

Law Offices of Sharon E. Duggan:
  Sharon E. Duggan

Counsel for Defendants and Respondents:      Department of Transportation:
  Ronald W. Beals, Chief Counsel,
  David Gossage,
  Lucille Baca,
  Janet Wong
    and
  Stacy Lau