Filed 6/1/15  Cal. Clean Energy Committee v. City of Pasadena CA2/7

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| CALIFORNIA CLEAN ENERGY COMMITTEE,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>CITY OF PASADENA,<br><br>    Defendant and Respondent. | B254889 and B255994<br><br>(Los Angeles County<br>Super. Ct. No. BS142693) |

APPEALS from a judgment and an order of the Superior Court of Los Angeles County, Thomas I. McKnew Jr., Judge.  Reversed.

Law Office of Eugene Wilson and Eugene S. Wilson for Plaintiff and Appellant.

Office of the City Attorney, Michele Beal Bagneris and Theresa E. Fuentes; Best Best & Krieger, Michelle Ouellette, Charity Schiller and Jennifer J. Kunz for Defendant and Respondent.

_____

**INTRODUCTION**

California Clean Energy Commission appeals from the denial of its petition for writ of mandate. Clean Energy argued the City of Pasadena's adoption of an environmental impact report and approval of the Glenarm Power Plant Repowering Project violated the California Environmental Quality Act. Clean Energy also appeals from the trial court's order granting in part and denying in part its motion to tax costs. In light of the failure of the City to adequately address the water issues arising from the project, we reverse.

**FACTUAL AND PROCEDURAL SUMMARY**

*The Glenarm Power Plant Repowering Project*

The City of Pasadena's power plant consists of two generating facilities bisected by Metro Gold line tracks: the Glenarm Plant, where four natural gas fueled turbines are located, and the Broadway Plant, which is the site of one active natural gas-fueled steam turbine.[1] With its Glenarm Power Plant Repowering Project (the Project), the City sought to decommission the one remaining 50-year-old steam generating unit at the Broadway Plant (B-3) and replace it with a combined-cycle natural gas-fueled turbine at the Glenarm Plant (GT-5).[2] B-3 and GT-5 are similar in size and have the same generation capacity (71 MW), but GT-5 would be 70 percent more fuel-efficient than B-3 and would employ "state-of-the-art" "Best Available Control Technology (BACT)" to reduce the emission of air pollutants—nitrogen oxide and carbon monoxide in particular.[3]

---

[1]     The power plant's total generation capacity is 226 MW.

[2]     "Combined cycle" means a portion of the natural gas introduced into the new turbine is converted to electricity by the gas turbine while the rest is used as heat to generate steam which is then also used to produce electricity.

[3]     GT-5 would "considerably reduce[]"nitrogen oxide and carbon dioxide emissions to 2 parts per million; B-3's existing exhaust concentration for nitrogen oxide is 10 parts per million and it does not have a carbon monoxide limitation.

Replacing B-3 with GT-5 would reduce greenhouse gas (GHG) emissions by approximately 20 percent on a per megawatt hour basis and would decrease natural gas consumption. In addition to its greater fuel efficiency (7,603 British thermal units per kilowatt hour for combined cycle generated electricity as compared to 10,414 British thermal units per kilowatt hour for steam generated electricity yielding an efficiency improvement of up to 37 percent based on the City's equipment configuration), the startup time for GT-5 would be 10 minutes as compared to 72 hours for B-3, further reducing fuel consumption.

The Project's underlying purpose is "increased reliability of local power generation," and several Project objectives also support the goals, objectives and policies set forth in the City's General Plan, South Fair Oaks Specific Plan and energy Integrated Resource Plan (IRP), "a blueprint for [the City of Pasadena Department of Water and Power (PWP)] to provide customers with a balance between reliable electricity service, consideration of environmental concerns, and competitive and stable rates, and reduced dependence on coal power." Project objectives include the "[m]aint[enance of] reliable local generation needed to provide uninterrupted power within the City as a contingency against dependence on a single electricity import connection to the City"; "[m]aint[enance of] the City's ability to generate power locally, as and when needed, to make up for any shortfall due to import or distribution system constraints"; "[i]mplement[ation of] the energy IRP approved by the City of Pasadena City Council with input and feedback from the community" (replacement of B-3 with a more reliable and efficient, local, natural gas-fueled, combined-cycle generating unit equipped with a state-of-the-art air pollution system was one of the energy IRP recommendations approved by the City Council); and "[p]rovi[sion] for mandated capacity (i.e., guarantee of availability) to generate power when required by the California Independent System Operator (CAISO) . . . ."

3

*Environmental Review and Project Approval*

The City prepared an Initial Study in September 2011 to assess the environmental impacts of the Project. The City then prepared an environmental impact report (EIR) to address the Project's potential impacts, project alternatives, and available mitigation. The EIR analyzed Project impacts based on the rated capacity for the new GT-5 of 8,760 hours per year, comparing it to B-3's actual historic use of 2,000 hours per year. The EIR concluded all impacts would be less than significant with mitigation, except impacts relating to green house gas emissions and land use and planning. As to those potentially significant and unavoidable impacts, the City weighed the Project's benefits against potential environmental harm and determined the "economic, technological and regional" Project benefits outweighed these effects. The City adopted these and other findings, certified the EIR and approved the Project on April 8, 2013.

*Petition for Writ of Mandate*

On April 29, 2013, Clean Energy filed its petition for writ of mandate, challenging the Project under CEQA. The trial court denied the petition.

Clean Energy appeals.

## DISCUSSION

### I.  *Standard of Review.*

"The standard of review applicable to "challenges to the certification of an EIR" (*Association of Irritated Residents v. County of Madera* (2003) 107 Cal.App.4th 1383, 1390 is "well-established: 'If the substantive and procedural requirements of CEQA are satisfied, a project may be approved even if it would create significant and unmitigable impacts on the environment. [Citation.] "In reviewing an agency's determination under CEQA, a court must determine whether the agency prejudicially abused its discretion. [Citation.] Abuse of discretion is established if the agency has not proceeded in a manner required by law or if the determination is not supported by substantial evidence." [Citation.] Courts are "not to determine whether the EIR's ultimate conclusions are correct but only whether they are supported by substantial evidence in the record and

4

whether the EIR is sufficient as an information document." [Citation.] "'The appellate court reviews the administrative record independently; the trial court's conclusions are not binding on it.'" [Citation.]' [Citation.]" (*City of Long Beach v. Los Angeles Unified School Dist.* (2009) 176 Cal.App.4th 889, 897 (*Long Beach*).)

"'"'"The EIR must contain facts and analysis, not just the bare conclusions of the agency.' [Citation.] 'An EIR must include detail sufficient to enable those who did not participate in its preparation to understand and to consider meaningfully the issues raised by the proposed project.'" [Citations.] "CEQA requires an EIR to reflect a good faith effort at full disclosure; it does not mandate perfection, nor does it require an analysis to be exhaustive." [Citation.]' [Citations.] 'The question whether an EIR is sufficient as an informative document depends on the lead agency's . . . compliance with CEQA's requirements for the contents of an EIR: whether the EIR reflects a reasonable, good faith effort to disclose and evaluate environmental impacts and to identify and describe mitigation measures and alternatives; and whether the final EIR includes reasonable responses to comments on the draft EIR raising significant environmental issues. [Citations.]' [Citations.] 'Analysis of environmental effects . . . will be judged in light of what was reasonably feasible.' [Citation.]" (*Long Beach, supra,* 176 Cal.App.4th at pp. 897–898.) (*City of Maywood v. Los Angeles Unified School District* (2012) 208 Cal.App.4th 362, 385-386.)

"Substantial evidence' is defined as 'enough relevant information and reasonable inferences from this information that a fair argument can be made to support a conclusion, even though other conclusions might also be reached.'"' 'Substantial evidence is not "[a]rgument, speculation, unsubstantiated opinion or narrative, evidence which is clearly inaccurate or erroneous, or evidence of social or economic impacts which do not contribute to, or are not caused by, physical impacts on the environment. . . . Substantial evidence shall include facts, reasonable assumptions predicated upon facts, and expert opinion supported by facts."' [Citations.]" (*Long Beach, supra,* 176 Cal.App.4th at pp. 898-899.)

*II. The Determination of Significant Impacts*

The Guidelines for the Implementation of CEQA (Cal. Code Regs., tit. 14, § 15000 et seq.; hereafter Guidelines), require an initial study to identify possible impacts that are not potentially significant to eliminate them from discussion in the EIR and to focus the scope of analysis. (Guidelines, § 15006, subd. (d) [public agencies should use initial studies to identify significant environmental issues and to narrow the scope of EIRs; § 15063, subds. (a), (c) [following preliminary review, the lead agency shall conduct an initial study to determine if the project may have a significant impact on the environment; an initial study will assist the preparation of an EIR, if one is required, "by (A) Focusing the EIR on the effects determined to be significant, (B) Identifying the effects determined not to be significant, (C) Explaining the reasons for determining that potentially significant effects would not be significant"].)[4]

Section 15063, subdivision (d)(3) of the Guidelines states that an initial study "shall contain in brief form . . . An identification of environmental effects by use of a checklist, matrix, or other method, provided that entries on a checklist or other form are briefly explained to, indicate that there is some evidence to support the entries. . . ." Furthermore, section 15128 provides: "An EIR shall contain a statement briefly indicating the reasons that various possible significant effects of a project were determined not to be significant and were therefore not discussed in detail in the EIR. Such a statement may be contained in an attached copy of an initial study."

"The EIR shall focus on the significant effects on the environment. The significant effects should be discussed with emphasis in proportion to their severity and probability of occurrence. Effects dismissed in an Initial Study as clearly insignificant

---

[4]     Section 15063, subdivision (f) of the Guidelines states: "Sample forms for an applicant's project description and a review form for use by the lead agency are contained in Appendices G and H. When used together, these forms would meet the requirements for an initial study, provided that the entries on the checklist are briefly explained pursuant to subdivision (d)(3). These forms are only suggested, and public agencies are free to devise their own format for an initial study. A previously prepared EIR may also be used as the initial study for a later project."

and unlikely to occur need not be discussed further in the EIR unless the Lead Agency subsequently receives information inconsistent with the finding in the Initial Study.  A copy of the Initial Study may be attached to the EIR to provide the basis for limiting the impacts discussed."  (Guidelines, § 15143.)  "The decision as to whether a project may have one or more significant effects shall be based on substantial evidence in the record of the lead agency."  (Guidelines, § 15064 subd. (f).)

> ### III.  *Energy Impacts*

In this case, the City concluded there would be no significant energy impacts from the Project.  The EIR explained that the Project would generate electricity in a more efficient manner by: comparing the efficiency of the old generator to the new one, specifying that continued use of B-3 would result in far greater amounts of greenhouse gas emissions; detailing that GT-5 would burn 40 percent less natural gas than B-3; explaining why the Project would not, in and of itself, substantially increase demand for, or cause a significant reduction in natural resources; and directly tying the Project to the City's compliance with the 33 percent Renewable Portfolio Standard mandated by Executive Order S-21-09 and the state mandate to increase the City's share of its energy portfolio deriving from renewable sources.

"Once the agency has determined that a particular effect will not be significant  . . . , the EIR need not address that effect in detail.  Instead, the EIR need only 'contain a statement briefly indicating the reasons for determining that various effects on the environment are not significant and consequently have not been discussed in detail in the environmental impact report."  (*Protect the Historic Amador Waterways v. Amador Water Agency* (2004) 116 Cal.App.4th 1099, 1109.)  The City concluded that, apart from water, there would be no other potentially significant impacts on energy conservation, and this determination is supported by substantial evidence.

Clean Energy argues that the City failed to address the fact the Project will waste "valuable thermal energy" because operation of GT-5 will generate and release heat.  According to Clean Energy, its evidence of the existence and use by other cities of a

7

combined heat and power system demonstrates that wasting this thermal energy is a potentially significant impact. In so doing, however, Clean Energy improperly conflates several portions of the analysis. (See, e.g. *Lotus v. Department. of Transportation* (2014) 223 Cal.App.4th 645, 656-658 [finding error where EIR compressed evaluation of impacts and mitigation issues].)

In preparing the EIR, the project proponent must first determine whether there are potentially significant impacts, here on energy, and, if there are, address alternatives that would reduce the impacts or measures that would mitigate them. (See, e.g. *California Clean Energy Committee v. City of Woodland* (2014) 225 Cal.App.4th 173, 206-209.) The proponent must include a detailed statement of mitigation measures designed to reduce "wasteful, inefficient or unnecessary consumption of energy" (Guidelines, Appendix F.) Here, Clean Energy starts from the position that the failure to consider the use of a combined heat and power system is a significant impact. We conclude, however, that it would be more appropriately considered as a mitigation measure. Such a measure would only be considered if, as is not the case, there was a lack of substantial evidence to support the conclusion that there is not a wasteful consumption of energy. Moreover, any mitigation measure must be both available and appropriate for the Project.

Substantial evidence supports the City's determination that replacing a 50-year-old generator with one that uses 40 percent less natural gas per operating hour will not result in a wasteful use of energy. (Public Resources Code, § 21165.)[5] No more was required. As the City explained, however, abandoning the existing power plant and replacing it with an entirely new "combined heat and power system" was not only inconsistent with the primary objectives of the Project but also entirely infeasible for a multitude of reasons; indeed, there was evidence such a system would increase the energy demand Clean Energy says it wants to reduce because the mild climate in Southern California does not necessitate operation of the Glenarm Plant at all times to meet the City's electricity needs. (*Concerned Citizens of South Central L.A. v. Los Angeles Unified*

_____

[5]     All statutory references, unless otherwise specified, are to the Public Resources Code.

8

*School Dist.* (1994) 24 Cal.App.4th 826, 861; Guidelines, § 15124, subd. (b).)  Thus, unlike the proponent in *Woodland*, the City both determined insignificance and adequately explained infeasibility.

### IV.  Climate Impact Issues

Clean Energy asserts that the City failed to adequately consider various climate mitigation measures.  The EIR, however, considered and rejected the measures at issue either because they did not reduce Project impacts or because they were infeasible.  The City explained that adoption of the "feed-in tariff" Clean Energy proposes was not appropriate in the context of the Project but that energy from feed-in sources such as private solar installations is already a component of the City's "energy blueprint" through 2023.  The City explained why requiring all new off-site development to install solar water heating was beyond the scope (and control) of the Project.  (Guidelines, § 15126.4; 15131, subd. (a).)  The City further explained why an "alternative fueling infrastructure including electric vehicle charging stations and hydrogen fueling facilities" was also infeasible.  (*A Local & Regional Monitor v. City of Los Angeles* (1993) 12 Cal.App.4th 1773, 1809 [lead agency must respond to comments proposing concrete, feasible mitigation measures but need not adopt them].)

Concerning Clean Energy's assertions of the potential for "urban heat island effects," the City explained why the Project does not cause such an impact.

The City adequately responded to proposed mitigation measures in its EIR. (*Los Angeles Unified School Dist. v. City of Los Angeles* (1997) 58 Cal.App.4th 1019, 1029; *San Franciscans for Reasonable Growth v. City and County of San Francisco* (1989) 209 Cal.App.3d 1502, 1519.)  Clean Energy has failed to meet its burden to demonstrate the City's reasons for rejecting the proposed mitigation measures were not supported by substantial evidence.  (*San Diego Citizenry Group v. City of San Diego* (2013) 219 Cal.App.4th 1, 17; *Anderson First Coalition v. City of Anderson* (2005) 130 Cal.App.4th 1173, 1185-1186.)

*V. Water Impacts*

Clean Energy challenges the City's analysis of the water impacts of the Project. Specifically, Clean Energy contends that the City failed to address the environmental impacts of supplying water to the Project. We agree.

As a preliminary matter, the City contends that Clean Energy challenges only the analysis of impacts to water infrastructure rather than the impact of supplying water to the Project. Clean Energy's brief does employ a section heading reading "Water Infrastructure Impacts." However, our inquiry is not limited to section headings; rather we examine the substance of Clean Energy's argument. Here, the text of Clean Energy's argument clearly challenges the EIR's failure to undertake analysis of the environmental impacts of supplying water to the Project. Clean Energy cites and relies upon several cases for the proposition that analysis of the environmental impacts of supplying water is required. (See e.g., *Stanislaus Natural Heritage Project v. County. of Stanislaus* (1996) 48 Cal.App.4th 182, 195 (*Stanislaus*); *Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 434.) We accordingly credit the content of Clean Energy's argument and will not deem its water impacts claim waived or forfeited. (See *Schmidt v. Bank of America, N.A.* (2014) 223 Cal.App.4th 1489, 1511 (claim not waived where appellant discussed issue but failed to cite key statute).)

Turning to the merits, we find the City's EIR inadequate because it lacks any meaningful analysis of the environmental impacts of furnishing water to the Project. The City's EIR provides that the proposed GT-5 turbine is expected to use 95,410,000 gallons of water annually, a 54,410,000-gallon increase in usage over the current B-3 plant. The City relies on the increased efficiency of the proposed turbine, noting that the GT-5 is nearly twice as efficient in its hourly water usage as the existing B-3 turbine.[6] (See Statement of Overriding Considerations: "Reduce water consumption by up to 53 percent, on a per megawatt hour basis, through the replacement of existing Unit B-3 with

---

[6] The proposed GT-5 unit would use approximately 10,892 gallons per operating hour versus approximately 20,459 gallons per operating hour for Unit B‑3.

the new Unit GT-5.")  However, this higher hourly efficiency is more than offset by an increase in operating hours.  Indeed, the proposed GT-5 unit is estimated to operate up to 8,760 hours per year, compared to an average of 2,004 annual operating hours for the existing Unit B-3.  Unit GT-5 therefore represents an increase of approximately 6,756 operating hours, or approximately 337 percent.

We note that the EIR also claims that "Unit GT-5 is likely to be used considerably less than 8,760 hours per year, as is the case with Unit B-3," resulting in lower water usage.  Regardless of the City's differing claims regarding projected operating hours, the Project seeks a permit to allow operation up to 8,760 hours per year.  CEQA analysis of water-related environmental impacts must therefore be based on this level of operation.  Accordingly, in reviewing the City's CEQA analysis, we rely on the EIR's explicit statement that "Unit GT-5 is estimated to operate a maximum of 8,760 hours per year" and is expected to consume 54,410,000 more gallons annually than the existing B-3 plant.

Despite its conclusion that annual increased usage of 54,410,000 gallons would not have a significant impact, the City contends that it has properly analyzed the impacts arising from the Project's water usage.  The Draft EIR identified three thresholds of significance relating to water impacts, concluding that the Project would have a significant impact if it would (1) use water in a wasteful, inefficient manner; (2) fail to maintain sufficient available water supplies to serve the Project; or (3) substantially deplete groundwater.  In analyzing each threshold, the City determined that there is sufficient water supply available from Pasadena Water and Power to meet Project demand.  The water supply analysis notes there is a gap between projected water demand and existing supply, and relies in part on new resources planned over a time frame ending in 2035.  Noting that the increased demand from the project would constitute approximately 5.1% of the City's increase in demand through 2035, and that there are 32 related projects anticipated that would further increase demand, the City concludes that there would be adequate water, and that there would be future discretionary review on the related projects.  The water supply documentation is silent as to the impact of obtaining the additional water supplies.  Based on the sufficiency of water supply, the City

11

concluded that water impacts were less than significant under each threshold. This analysis is legally inadequate.

"The purpose of CEQA is . . . to compel government at all levels to make decisions with environmental consequences in mind." (*Bozung v. Local Agency Formation Com.* (1975) 13 Cal.3d 263, 283 (*Bozung*); *accord Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 393; *Citizens of Goleta Valley v. Board of Supervisors* (1990) 52 Cal.3d 553, 564; see Cal. Code Regs., tit. 14, § 15002 subd. (a)(1) (one of the "basic purposes" of CEQA is to "[i]nform governmental decision-makers and the public about the potential, significant environmental effects of proposed activities").) CEQA does not "guarantee that these decisions will always be those which favor environmental considerations," but it does seek to ensure that environmental consequences are considered. (*Bozung*, *supra*, 13 Cal.3d at p. 283.) Where an EIR fails to satisfy this informational requirement by failing to evaluate a project's environmental consequences, "a fundamental purpose of CEQA" is defeated and the approving agency's decision must be set aside as the agency has "not proceeded in a manner required by law." (§ 21168.5; *Stanislaus*, *supra*, 48 Cal.App.4th at p. 195; *see Laurel Heights Improvement Assn.*, *supra*, 47 Cal.3d at p. 392.)

Here, the environmental consequence of concern is the supply of 54,410,000 additional gallons of water to the Project each year. EIRs must, however, analyze the impacts of supplying water to projects. In *Santiago County Water Dist. v. County of Orange* (1981) 118 Cal.App.3d 818 (*Santiago*), the County of Orange approved an EIR prepared to examine the consequences of permitting a mining company to operate a sand and gravel mining operation. The EIR contained no information concerning the environmental effects of supplying water to the project. The County of Orange nonetheless found the EIR complete and adequate and approved a site permit for the sand and gravel project. The court noted that the EIR did not include "facts from which to evaluate the pros and cons of supplying the amount of water that the mine will need." (*Id.* at p. 829.) Instead, the EIR simply indicated the amount of water required for the project and explained that "[t]he [County Water] District has indicated their ability to

12

supply the water." (*Id.* at p. 830.) The court found this explanation "insufficient to allow the EIR to fulfill its informational purpose. The EIR must contain facts and analysis, not just the bare conclusions of a public agency." (*Id.* at p. 831.) Though the EIR acknowledged that there would be "[i]ncreased demand upon water available from the Santiago County Water District," what was required was "some information about how adverse the adverse impact will be." (*Ibid.*) Since the EIR contained no meaningful discussion of the environmental impacts of supplying water to the project, the court held the EIR was inadequate. (*Ibid.*)

Likewise in *Stanislaus*, environmental groups challenged Stanislaus County's approval of an EIR for a 5,000-unit residential development and resort. Though the development lacked an on-site water source and required more than 10 million gallons of water per day, the EIR lacked "any analysis of significant environmental effects of supplying that water." (*Id.* at p. 186.) The court found that the EIR's failure to address the issue undermined the "fundamental" informational purpose of CEQA. (*Id.* at p. 195.) The county "could not make an informed decision on whether to adopt [the plan] without being informed, to some reasonable degree, of the environmental consequences of supplying water to a 5,000 residential unit development which has no on-site water source." (*Id*. at p. 199.) The court accordingly held that the EIR was inadequate. (*Id.* at pp. 205-206.)

Here, as in *Stanislaus* and *Santiago*, the EIR approved by the City of Pasadena lacks any meaningful analysis of the environmental impacts of supplying water to the Project. As in *Santiago*, the City rests its conclusions regarding the environmental impacts of water use on the bare fact that Pasadena Water and Power will be able to supply sufficient water to the Project. The EIR provides no "facts from which to evaluate the pros and cons of supplying the [requisite 95,410,000 gallons] of water" to the Project. (*Santiago, supra*, 118 Cal.App.3d at p. 829.) This conclusory approach fails to satisfy CEQA's fundamental informational requirements. (See *Stanislaus*, *supra,* 48

13

Cal.App.4th at p. 195.)  As the City has failed to proceed in the manner required by CEQA, the City's approval of the EIR must be set aside.  (§ 21168.5.)

*VI.  Costs*

The City filed a memorandum of costs in the amount of $37,207.49 ($36,477 for preparation of the administrative record (173.7 hours of paralegal time), $420.74 for courier fees, $300 for court reporter fees and $9.75 for filing and motion fees).  Clean Energy filed a motion to tax costs, and the City filed opposition.  After hearing argument, the trial court granted the motion in part reducing the cost award to a total of $12,000. In light of our ruling, we reverse the costs award.

**DISPOSITION**

The judgment and order regarding costs are reversed, and the matter remanded for further proceedings in accordance with this opinion.  California Clean Energy is to recover its costs on appeal.

ZELON, J.

We concur:

PERLUSS, P. J.

STROBEL, J.[*]

---

[*]     Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.